**LOCAL 397, INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL SALARIED MACHINE AND FURNITURE WORKERS, AFL–CIO, Plaintiff,**

v.

**MIDWEST FASTENERS, INC., d/b/a Erico Fastening Systems, et al., Defendants.**

Civ. No. 90–4114 (CSF).

United States District Court, D. New Jersey.

Jan. 9, 1992.

See also 763 F.Supp. 78.

Tomar, Simonoff, Adourian & O'Brien by Howard S. Simonoff, Theodore M. Lieverman, Haddonfield, N.J., for plaintiff.

Archer & Greiner by Arthur H. Jones, Jr., Steven W. Suflas, Haddonfield, N.J., for defendants.

## OPINION

CLARKSON S. FISHER, District Judge.

Before this court is a motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure by defendants, Erico International, Inc. ("International"), Erico Investment Company, Inc. ("Investment") and Erico Products, Inc. ("Products"), requesting that the court dismiss the plaintiff's complaint alleging liability under the Worker Adjustment and Retraining Notification Acts of 1988 (the "WARN Act"), 29 U.S.C. § 2101 et seq. Also before this court is a cross-motion for partial summary judgment as to the liability of Investment and International brought by plaintiff, Local 397, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO ("Local 397"). Plaintiff has stipulated to the dismissal of Products as a defendant in this action. For the reasons set forth below, the defendants' motion for summary judgment is denied, and the plaintiff's motion for partial summary judgment as to the liability of Investment and International is granted.

*Statement of the Case*

This action is brought by Local 397 under the WARN Act, 29 U.S.C. § 2101 et seq. The plaintiff claims that defendant Midwest Fasteners, Inc. d/b/a Erico Fastening Systems ("EFS") failed to provide plaintiff's members with sixty (60) days' notice prior to the closing of its Moorestown, New Jersey, plant as required by the WARN Act. Essentially, the plaintiff is seeking sixty days' pay and benefits for each employee in the bargaining unit. In addition to EFS, plaintiff has named as defendants EFS's parent, International, and International's parent, Investment. Plaintiff's theory of the case is that Erico is a single, integrated enterprise with separately incorporated subsidiaries for tax reasons and to meet local requirements in other countries.

Defendants Investment and International have moved for summary judgment, arguing that plaintiff should not be permitted to hold EFS's corporate relatives liable for any alleged violations of the WARN Act. Plaintiff has cross-moved for partial sum-

mary judgment as to the liability of defendants International and Investment. Because the parties have submitted a substantial amount of material, the court will apply the relevant factual material to the various legal tests set forth below.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Brown v. Hilton*, 492 F.Supp. 771, 774 (D.N.J.1980). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This "burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

There is no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510-11. In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court, however, is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. The facts of this case are undisputed, and both parties urge this court to resolve the parental liability issue.

These cross-motions require the court to evaluate the corporate structures of the defendants to determine whether International and Investment are proper defendants in this action. As the starting point for analysis of this issue, the court must examine the statute upon which plaintiff has based its cause of action.

The WARN Act, 29 U.S.C. § 2101 et seq., was enacted by Congress in 1988 to provide workers with job security by requiring "employers" falling within the statutory definition to give at least sixty days' advance notice of any plant closing or mass layoff. 29 U.S.C. § 2101(a). The Act sets forth the definition of employer. The section provides:

> (1) The term "employer" means any business enterprise that employs
>
> (A) One hundred or more employees, excluding part-time employees; or
>
> (B) One hundred or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime);

29 U.S.C. § 2101(a)(1).

The plaintiff alleges that EFS, a wholly-owned subsidiary of International, a wholly-owned subsidiary of Investment, failed to provide the requisite sixty days' notice when it closed its Moorestown, New Jersey, plant. It is undisputed that EFS fits the statutory definition of an employer. Plaintiff, however, believes that, should it obtain a judgment against EFS for its WARN Act violation, EFS will be unable to pay such judgment. Accordingly, plaintiff, alleging that the parent companies should be held liable for the acts of their subsidiary, seeks to hold EFS's parent, International, and International's parent, Investment, liable for EFS's WARN Act violation. In the alternative, the plaintiff seeks to hold Investment and International directly liable for the WARN Act violation because, plaintiff contends, it was the corporate parent's decision to close the Moorestown facility, thereby causing the WARN Act violation.

Both plaintiff and defendants point to the Department of Labor regulations concerning when it is appropriate to hold a separate entity liable as an employer under the WARN Act. 20 C.F.R. § 693.3(a)(2), 54

Fed.Reg. 16065 (April 20, 1989). The regulation provides:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

*Id.* Although the parties disagree over whether the D.O.L. regulations are substantive or interpretive, the difference in this case seems to be a difference without distinction, because both plaintiff and defendants rely on the regulations in urging the court to apply the law that each believes best benefits its point of view. It is this question of what law to apply in determining whether the parent can be held liable for the actions of a subsidiary that the court must initially confront.

## I. The Appropriate Rule of Decision

As previously set forth, the D.O.L. regulations provide that subsidiaries which are wholly or partially owned by a parent company will be treated as separate employers depending upon the degree of their independence from the parent. This determination is made based on "existing legal rules" and the five factors enumerated in the regulation. While it is true that the defendant argues that these regulations do not have the force of law, both parties point to the Department of Labor's "supplementary information" for the interpretation of the meaning of "existing legal rules." *See* 54 Fed.Reg. 16045 (April 20, 1989). The Federal Register states:

> The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN purposes; the definition is intended only to summarize existing law that has developed under *state corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA)*. The Department does not believe that there is any reason to attempt to create new law in this area, especially for WARN purposes, when relevant concepts of state and federal law adequately cover the issue. Thus, no change has been made in the definition. Similarly, the regulation is not intended to foreclose any application of existing law or to identify the source of legal authority for making determinations of whether related entities are separate....

*Id.* (emphasis added).

Thus, the D.O.L. believes that to determine whether a subsidiary is sufficiently independent of the parent so as to negate the WARN liability of the parent, both state corporation law and federal common law as it relates to federal employment statutes should be evaluated in conjunction with the five factors enumerated in the regulation. It is apparent that the D.O.L. did not envision a conflict between state corporation law "alter ego" and "piercing the corporate veil" doctrines and the federal common law "single employer" doctrine. Yet an inherent difference in the interpretation of the parent/subsidiary relationship within the various spheres has been perceived. *See Holcomb v. Pilot Freight Carriers, Inc.*, 120 B.R. 35, 43 (M.D.N.C.1990) (in federal question cases "Congress often adopts an expansive definition of [employer]. In such an instance, less importance is placed on the corporate form and the inquiry of who is an employer usually gives less respect to the corporate form when applying the common law alter ego doctrine.")

The defendants urge this court to formulate a rule of decision that is consistent with Third Circuit precedent by applying "federal common law alter ego factors." Defendants' reply memorandum at p. 8. The defendants' formulation of the federal common law alter ego test includes the criteria enumerated in cases that have evaluated federal labor statutes. *See id.* at p. 12 ("The reason for the DOL's citation to

other federal labor statutes is not that they are to serve as the rule of decision in WARN cases. Rather, case law under these other statutes are to provide criteria for courts to consider along with traditional federal common law elements, since the former also arises out of the latter").

Alternatively, the defendant urges the court to utilize the D.O.L.'s suggested list of factors giving "due consideration to the federal common law factors." *Id.*

Although no court has decided the issue currently presented, the court believes that the most appropriate analysis of the issue includes a review of the Third Circuit cases that have been decided under the common law interpretation of "piercing the corporate veil" and "alter ego" doctrines, as well as the federal common law's "single employer" doctrine incorporated in the federal statutes enumerated above. *See* 54 Fed. Reg. 16045 (NLRA, FLSA and ERISA). For the most part, these cases have synthesized the relevant state common law considerations inherent in parent/subsidiary analysis. Additionally, this court will apply the five factors enumerated by the D.O.L. to evaluate further whether the parent can be held liable for the WARN Act violation of the subsidiary. While this approach may seem unduly cumbersome, it is imperative to keep in mind that the determination of whether a parent can be held liable for the acts of its subsidiary is a fact-specific inquiry. *Allied Corp. v. Frola,* 701 F.Supp. 1084, 1089 (D.N.J.1988) ("every case in which a piercing of the corporate veil is sought is sui generis and must be evaluated on its facts."). The court will undertake this examination by applying the undisputed facts, as presented by the parties, to the various standards set forth by the federal courts for a determination of whether to hold the parent liable in this case.

## II. Application of Facts to the Various Tests

### A. *Third Circuit "Alter Ego" Doctrine*

■ Primarily, it should be noted that the court is not engaged in a formal application of an established legal test. *Phoe-*

*nix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1476 (3d Cir.1988) ("The relationship between parent and subsidiary corporations has been a fruitful source of litigation and although the case law on the subject is extensive, it is neither uniform nor clear. Some decisions apply an agency theory to assess parental liability, others focus on an alter ego basis, and some speak in the terms of 'piercing the corporate veil.'"); *American Bell, Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 886 (3d Cir.1984) (the tests for piercing the corporate veil are "imprecise in their various formulations"). Rather, the court is undertaking a fact-specific inquiry whereby the court must determine from a multiplicity of criteria whether the operations of the parent and subsidiary are so interrelated as to hold the parent liable for the violation of the WARN Act by the subsidiary.

Although New Jersey law does not provide the law of the case in this instance, an evaluation of the standards applied to pierce the corporate veil under state common law will be helpful in determining the federal standard to be applied. In *State, Department of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 500, 468 A.2d 150 (1983), the New Jersey Supreme Court explained that the law of that state prevents the corporate veil from being pierced easily. *Id.* ("Except in the case of fraud, injustice, or the like, courts will not pierce a corporate veil."). The court stated:

> We begin with the fundamental proposition that a corporation is a separate entity from its shareholders ... and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise.... Even in the case of a parent corporation and its wholly-owned subsidiary, limited liability will not be abrogated....

*Id.* (citations omitted).

The court explained that a parent will not be held liable "unless the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice or otherwise to circumvent the law." *Id.* at 501, 468 A.2d 150. Thus,

under the New Jersey common law it is difficult for a plaintiff to pierce the corporate veil.

■ The Third Circuit standard in common law cases for piercing the corporate veil, or the "alter ego doctrine" is also difficult for a plaintiff to meet. *See American Bell, Inc.,* 736 F.2d at 887 (quoting *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir. 1967) "There must be 'specific, unusual circumstances' ")). The plaintiff bears the burden of convincing the court that it should invoke this "tool of equity" to "prevent fraud, illegality or injustice" or if allowing the parent to be shielded from liability "would defeat public policy or shield someone from public liability for a crime." *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir.1983) (quoting *Publicker Indus. v. Roman Ceramics, Corp.,* 603 F.2d 1065, 1069 (3d Cir.1979)). The Third Circuit has delineated a nonexclusive list of factors that the court should look at to determine whether to disregard the corporate entity. *See United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). Adopting the standard utilized in the Fourth Circuit, the *Pisani* court explained that, in addition to determining whether the corporation is grossly undercapitalized, the court should also evaluate the following factors:

> failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, nonfunctioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Id.* (citing *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686–87). Additionally, the Third Circuit explained that the situation "must present an element of injustice or fundamental unfairness." *Id.*

■ In examining these factors, it should be remembered that the mere existence of a parent-subsidiary relationship does not provide a basis for holding a parent liable. *American Bell, Inc.,* 736 F.2d at 887. Moreover, simply because a parent controls the subsidiary's stock and participates in the subsidiary's management, parental liability is not created. *Id.*

■ With this in mind, the court must apply the facts of this case to the criteria enumerated above.

#### (i) Gross undercapitalization

"One of the most compelling factors, applicable to all types of corporations in judging whether or not to retain limited liability is the adequacy of the capitalization of the enterprise." *Connors v. Peles,* 724 F.Supp. 1538, 1561 (W.D.Pa.1989) (quoting *Carpenters Health,* 727 F.2d at 284). The standard utilized in this circuit is "gross undercapitalization." *Id.* The plaintiff contends that EFS "depended entirely on regular and massive transfers of cash from the parents." Plaintiff's brief at p. 101. Further, plaintiff contends that these infusions of capital were carried on the parents' books as loans, and not as investments, and therefore, EFS was inadequately capitalized. *Id.* at 103. To the contrary, defendants contend that EFS was "an independent corporation operating with over $25,000,000 in annual sales and $25,000,000 in assets, which included: real estate, buildings, machinery, equipment and inventory." Defendants' reply brief at p. 21. The defendants continue by asserting that International's original investment in EFS was $14,500,000, which included the forgiveness of previous debts incurred by EFS to International. *Id.*

Further, plaintiff contends that EFS's only source of outside cash was a loan from Ameritrust, Inc., which was guaranteed by the parents. Plaintiff's brief at p. 101. Defendants assert that it was EFS that obtained the loan from Ameritrust, and International merely guaranteed the loan. Defendants' reply brief at p. 21. Plaintiff also contends that the parents executed guarantees on other loans and extensions of credit to EFS. Plaintiff's brief at p. 11. Because the standard in the Third Circuit is "gross undercapitalization," the court does not believe that EFS was gross-

ly undercapitalized, given the frequent infusions of capital by International and the amount of EFS's assets.

#### (ii) Nonpayment of dividends

"A second factor recommended by the courts is the inability or failure of a corporation to pay dividends." *Connors*, 724 F.Supp. at 1562. No dividends were paid by EFS to its only shareholder, International. This factor weighs in favor of defendants, however, because it shows that the parents were not siphoning funds from the subsidiary.

#### (iii) Nonfunctioning of some officers or directors

"A third standard applied by the courts to a determination of the propriety of piercing the corporate veil is whether the officers and directors of the corporation played any legitimate function, or whether they were but figureheads or token officeholders." *Connors*, 724 F.Supp. at 1563. "During the period 1988–1990, the following individuals were officers of EFS: A.M. Kies, President; Richard C. Craven, Vice-President and General Manager; Robert B. Church, Secretary–Treasurer. On December 1, 1989, Jeffrey Church, the son of Robert Church, replaced Craven as General Manager. During the entire period, Kies and Robert Church were the sole two directors of the corporation." Plaintiff's brief at p. 8.

The directors of EFS held regular board meetings (defendants' Exhibit A, Church 92–97), the directors made substantive decisions on how the company was operated (defendants' Exhibit B, pp. 3–5), and the General Manager served as its top executive and was in charge of all day-to-day operations (defendants' Exhibit I, p. 1; Exhibit J, p. 1). Therefore, it cannot be said that any of the aforementioned individuals were merely figureheads of EFS. Accordingly, this factor does not militate against the defendants.

#### (iv) Failure to observe corporate formalities

While it is true that the plaintiff urges this court to look past the corporate for-

malities, whether the corporations observed proper corporate formalities is a factor under the Third Circuit alter ego test. "The failure of the principals to observe corporate formalities is yet another factor that is determinative of [parental] liability." *Connors*, 724 F.Supp. at 1563. It is apparent from the facts presented that the defendants scrupulously observed corporate formalities. Articles of incorporation were filed and maintained by the company, by-laws were adopted and stock certificates issued. Defendants' brief at p. 22. Directors and officers were named, meetings of the corporation's directors were regularly held and corporate minutes were taken and retained. *Id.* EFS kept separate and extensive corporate records. *Id.*

> These records include corporate minutes, comprehensive financial reports, bank accounts, and intra-company balance sheets.... EFS had its own distinct credit arrangement with Ameritrust, separate and apart from any financial relationship between its parent companies and that lender. EFS also generated its own monthly general manager's reports, along with monthly manufacturing, materials management, financial and personnel reports, all of which were submitted to its board of directors. And, while Investment was required by law to file consolidated federal tax returns on behalf of all companies in the corporate family, EFS filed its own separate New Jersey State tax returns, which included a "dummy" federal form encompassing its operations only.

*Id.* at 22–23 (footnotes omitted).

Plaintiff provides further evidence of defendants' observance of corporate formalities.

> On August 24, 1990, at approximately 7:00 A.M., Robert Church and Kies met as the directors of Midwest Fasteners, in the offices Erico International in Ohio.... There they resolved to recommend to the directors of Erico International and Erico Investment that Midwest Fasteners be sold or liquidated.... William Roj, a director of Erico Invest-

ment, was present as legal counsel.... The meeting lasted approximately fifteen to twenty minutes and then adjourned. Robert Church and Kies then immediately reconstituted themselves as the directors of Erico International and endorsed the recommendation to discontinue operations of EFS and to liquidate or sell the company.... The meeting lasted approximately fifteen minutes and then was adjourned.... Nobody else was present at either of these two meetings....

Shortly thereafter, as 8:30 A.M., the directors of Erico Investment met at the same office, where Kies and Robert Church were joined by Erico Investment directors R. Dickson, G. Dunn, William Roge and E.M. Zacher.... During the course of that meeting ... the Erico Investment directors voted to authorize the sale or liquidation of Midwest Fasteners.

Plaintiff's brief at pp. 25–26.

This vignette demonstrates EFS's commitment to corporate formalities. Therefore, this factor balances in favor of the defendants.

### (v) Facade for the operations of dominant shareholders

It is apparent that EFS was not merely a "facade" for the operations of International and Investment. To the contrary, EFS was a substantial corporation owning in excess of $25,000,000 in assets, which included "the real estate and manufacturing facility in Moorestown, machinery and equipment, furniture and fixtures and sizeable inventories as well as other intangible assets, such as patents, trademarks and good will." Defendants' brief at p. 27. Moreover, the defendants assert that each subsidiary is an independent operation whose boards of directors approve expenditures, develop employee benefit plans and make all day-to-day decisions. *Id.* EFS had its own customer base, accounting staff, sales staff, quality control staff and manufacturing work force. *Id.*

It cannot be said, under the "alter-ego" test, that EFS was merely a "corporate shell." Under this test, this factor balances in favor of the defendants; however, this factor will be re-examined below.

### (vi) Absence of corporate records

As stated previously, EFS maintained extensive corporate records. The plaintiff does not attempt to refute this factor. Therefore, like the observance of corporate formalities factor, this factor balances in favor of defendants.

### (vii) Insolvency

There is no question that it was EFS's insolvency that precipitated the plant shutdown. This fact, however, cannot weigh in favor of the plaintiff. Generally, when courts are determining whether to pierce the corporate veil, they are confronted with cases where the parent has drained the assets of the subsidiary, thereby causing insolvency. In this case, the court is confronted with precisely the opposite situation, where the subsidiary was draining money from the parent. *See* defendants' brief at pp. 25–26 and cited exhibits. Therefore, this factor does not balance in favor of the plaintiff.

### (viii) Commingling of funds

Because, as previously demonstrated, there was strict adherence to the relative corporate forms, there was no commingling of funds.

### (ix) Siphoning of funds

Similarly, there is no evidence of the siphoning of funds by the corporate parents from EFS. To the contrary, there is substantial evidence that the parents infused money into EFS.

### (x) Fraudulent intent in formation

"A fraudulent intent behind incorporation has been viewed as exceptionally pertinent." *Connors,* 724 F.Supp. at 1569. There has been no evidence presented that weighs in favor of finding a fraudulent intent in formation of the subsidiary corporation.

Having evaluated the factors listed above under Third Circuit alter ego analysis, it is evident that if the court's inquiry were to stop here International and Investment could not be held liable for the WARN Act violation of EFS. As previously explained, however, this is not the only test that the court will apply.

### B. *"Single-employer" doctrine*

■ Next, the court will examine the "single-employer" theory, often advanced under federal labor statutes. It should be noted that the determination of whether a parent corporation is an "alter ego" of a subsidiary is an entirely different analysis from whether it can be found to be a "single employer" with its subsidiary. *Penntech Papers, Inc. v. N.L.R.B.*, 706 F.2d 18, 23–24 (1st Cir.1983). Under the single-employer or "single-enterprise" test, the question is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise." NLRB v. Browning–Ferris Indus., Inc.*, 691 F.2d 1117, 1122 (3d Cir.1982) (emphasis in original). In applying the test the court must consider four factors: (i) common ownership, (ii) common management, (iii) centralized control of labor relations and (iv) functional integration of operations. *Id.*

■ The Third Circuit in *Browning–Ferris* pointed out that: " 'Single employer' status ultimately depends on all circumstances of the case and is characterized as an absence of an arm's-length relationship found among unintegrated companies." *Id.* It should be noted that "no one of the factors is conclusive; instead, the [court] must weigh the totality of the circumstances and determine whether the parent exercised such pervasive control of the subsidiary at the policy-making level that the purposes of the labor laws are served by treating the two entities as one." *Esmark, Inc. v. NLRB*, 887 F.2d 739, 753 (7th Cir. 1989). While the standard enumerated above is utilized primarily in cases under the NLRA, the theme of the standard, which is to place less emphasis on corporate form and assess the "economic reality" of the corporate relationship, is the pervasive theme in cases under other federal labor statutes, namely, ERISA and the FLSA. Therefore, an application of the facts of this case to this test will serve as the second portion of the court's analysis.

### (i) Common ownership

It is undisputed that EFS is a wholly-owned subsidiary of Erico International, which is a wholly-owned subsidiary of Erico Investment, which is a wholly-owned subsidiary of Erico Holding Company. These corporate distinctions, argues the plaintiff, mean nothing, because "Erico Investment owns 100% of the assets and exercises total control over EFS...." Plaintiff's brief at p. 81. The defendants feign an argument, stating that the companies have different ownership because EFS is owned by International, International is owned by Investment and Investment is owned by Holding, which has eighteen different shareholders and over 80,000 shares outstanding. Defendants' reply brief at p. 29. It is imperative to note that Robert Church and Kies own 75% of Erico Holding stock. It is clear that common ownership exists in this relationship. *See Penntech,* 706 F.2d at 26. Therefore, this factor balances in favor of plaintiff. Defendant, however, is correct in asserting that this is the least important factor to be considered. *American Bell,* 736 F.2d at 887 (common ownership is insufficient by itself to establish liability under the NLRA).

### (ii) Common management

There is substantial evidence that there is common management of the corporations. Kies is the president of EFS, International, Investment and Holding. Robert Church is secretary-treasurer of all four corporations. Kies is president and Church is secretary-treasurer of all domestic subsidiaries.

Additionally, Robert Church and Kies are the sole directors of EFS, International and all domestic subsidiaries. Kies and Robert Church are also the directors of Investment, along with Kies's wife, Erico's general counsel and two other individuals. Robert Church and Kies are directors of Erico

Holding, along with Kies's wife. All of this certainly establishes common management.

But defendants argue that local management was unique to EFS. Defendants' reply brief at p. 29. While this statement is true, it ignores the fact that at the time of the closing of the plant Robert Church's son, Jeffrey Church, was the general manager of the operation. Therefore, given the familial relationship, it is apparent that the companies have common management.

#### (iii) Centralized control of labor relations

In evaluating whether the parents exercise central control of labor relations, the test is not whether day-to-day matters were handled at a local level; rather, the test is "whether the controlling company possessed the present and apparent means to exercise its clout in matters of labor negotiations by its divisions or subsidiaries." *Penntech*, 706 F.2d at 26 (quoting *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1075 (1st Cir.1981)). Defendants assert that EFS had its own personnel department and its employees worked only for EFS. Additionally, defendants contend that EFS hired and fired all employees, fixed their fringe benefits and handled all grievance disputes. Defendants' brief at p. 32. Further, the defendants state that the EFS personnel manager developed and administered the subsidiaries' personnel policies, as well as handled matters relating to benefits, labor relations and the paying of employees. Moreover, defendants argue that EFS's personnel department handled all day-to-day paper work for the work force, all employment tests, work performance evaluations and retirement plans. Defendants' reply brief at pp. 23–24.

To the contrary, the plaintiff contends that the Erico International corporate policy and practices manual, which "sets forth detailed guidelines (whether mandatory or suggested) related to hiring, employee termination, salary levels, benefits and other aspects of employment for all employees, including salaried and sales personnel" were all adopted by EFS. Plaintiff's brief at pp. 90–91. The defendants point out that the plaintiff makes no citation to the record to support this contention. Defendants' reply brief at p. 23. Further, the defendants argue that the manual explicitly states that it is to serve merely as a guide to Erico's subsidiaries, and not as an absolute requirement. Defendants' reply brief at p. 23 (citing Exhibit 65 at 1020). In fact, the manual states, "We recognize that individual units must have flexibility to tailor such procedures to fit the unique needs of their organizations." *Id.*

Nevertheless, these decisions concern the day-to-day operations of EFS. The court believes that the most critical fact that must be evaluated is the handling of labor decisions, which reflect corporate policy. The plaintiff asserts that Richard Craven, EFS's former general manager, negotiated the collective bargaining agreement with the union while he was the paid agent of Erico International. Plaintiff's brief at p. 90. Defendants rebut this contention by asserting that EFS's local management negotiated the most recent collective bargaining agreement with plaintiff and explained that when Craven negotiated the initial collective bargaining agreement he was merely managing the company for International, before the corporation purchased it. Thus, International could not have been exercising parental domination, because EFS was not yet its subsidiary. The court reluctantly agrees with this argument.

As will be discussed below, however, it is apparent that Kies and Robert Church, acting in their roles as directors of the parent companies, formulated the decision to close EFS and, therefore, made the most critical policy decision in terms of control of labor relations. This decision was to close the Moorestown facility. Therefore, this factor, centralized control of labor relations, must be viewed in relation to Part III of this court's opinion, concerning the individuals or entity that made the decision to close the plant.

#### (iv) Functional integration of operations

After an exhaustive review of the record, it appears that EFS and Erico International and Investment are inextricably inter-

twined. While not conclusive in themselves, the Erico "blue book," plaintiff's Exhibit 59, and the Erico video, plaintiff's Exhibit 60, demonstrate clearly the degree of interrelation of the corporations and the subsidiaries. The blue book provides:

ERICO INTERNATIONAL CORPORATION, headquartered in Salon (Cleveland), Ohio, is a diversified international corporation with manufacturings and sales operations world wide.

A diverse product range allows ERICO INTERNATIONAL to serve railroad, mining, construction, manufacturing, electrical, electrochemical, electrical utility and communication industries and markets.

ERICO INTERNATIONAL believes in providing superior customer service and on-time delivery. ERICO INTERNATIONAL backs this commitment with an emphasis on engineering and manufacturing quality products. Continuous research and development efforts provide product line expansion to meet our customers [sic] future needs.

Plaintiff's brief at p. 31 (citing plaintiff's Exhibit 59). In addition, the videotape states:

The Electrical Railway Improvement Company has become Erico International Corporation, a close-knit group of companies dedicated to doing it right and doing it better. Today, Erico International provides a broad spectrum of quality products to a diverse range of markets, in areas as wide as the world.

Yes, nobody does it better than Erico International. It is a commitment that begins at the very top and extends to every level of the Erico organization.

The responsibility for keeping this corporate commitment lies with the board of directors [showing the Erico Investment directors]. Line operations are divided into four regional groups. Each of the four regions currently has, or will in the future have, a management team headed by an Erico vice-president.

Plaintiff's brief at pp. 33–34 (citing plaintiff's Exhibit 60). Having read the blue book and viewed the videotape, it is the court's distinct impression that there is a functional integration of the operations of the various corporations.

Additionally, the plaintiff has shown that International has supplied insurance, obtained registered agents, and provided legal and auditing services to its subsidiaries.

To the contrary, the defendants argue that EFS manufactured a discrete product line, independent of the product of the other international subsidiaries. Defendants also argue that EFS did not use the raw materials produced by other subsidiaries and sold less than 20% of its products to "overseas Erico subsidiaries, all through arm's-length deals." Additionally, defendants argue that EFS had its own sales staff and its own domestic customer base, marketed its own products and maintained its own facilities. Additionally, defendants assert that EFS has its own $5,500,000 asset based loan from Ameritrust and made all of its own operational decisions with respect to the loan. Further, defendants contend that only after EFS's board failed to negotiate an increase in its credit limit did International reconfigure its own financial arrangements. The defendants' arguments ignore the fact that EFS's board was also International's board. Therefore, this factor weighs in favor of the plaintiff.

Examining the factual setting as a whole, it is readily apparent that under the "single-employer" test International and Investment could be considered a single enterprise with EFS. Thus, under the alter ego test outlined in Part A and the single-employer test just discussed, there are conflicting results. The apparent conflict between the two tests will be resolved after application of a third test, the D.O.L. factors.

### C. D.O.L. Regulations

The court now turns to the five factors listed by the D.O.L., 20 C.F.R. § 693.3(a)(2). The factors include: (i) common ownership, (ii) common directors and/or officers, (iii) unity of personnel policies emanating from a common source, (iv) the dependency of operations and (v) de facto exercise of con-

trol. *Id.* The court has found that EFS and its parents shared common ownership and common directors and/or officers. As previously stated, these factors balance in favor of the plaintiff. Additionally, the third factor utilized in the D.O.L. analysis has been discussed by the court in Part B(iii) under centralized control of labor relations. The court found that, while there is no conclusive proof that International and Investment were actually controlling the EFS work force, it was apparent that the parents were making significant policy decisions affecting the labor force. This analysis will be developed in Part III of the court's opinion.

Similarly, factor (iv) of the D.O.L. regulations, the dependency of operations, has been discussed by the court at Part B(iv) under functional integration of operations. The court has found after review of the record that EFS was an integrated component of the world-wide Erico machine, and therefore, this factor balances in favor of the plaintiff.

Factor (v), de facto exercise of control, is perhaps the most compelling factor that the court will examine. Analysis of this component of the test permits the court to examine the facts of the case to determine what is really going on in the relationship between the parent and the subsidiary.

#### v. *De facto exercise of control*

The court finds that Investment and International did, in fact, exercise a substantial degree of control over EFS. Primarily, as will be discussed in Part III of the court's opinion, it was Kies and Robert Church, directors of all of the corporations, that voted to close the Moorestown facility. Despite the corporate formalities that were strictly adhered to, the "economic reality" is that the directors of International and Investment made the decision to shut the EFS plant.

Additionally, the video and blue book exhibit the parents' desire to demonstrate that ERICO is in fact a single corporate family. It appears that one of the reasons that the different corporations observe the corporate formalities was to preserve their right to sever such familial ties if some hardship developed and if such severance was in the best interest of ERICO.

Moreover, Jeffrey Church, the general manager of EFS, is Robert Church's son. This close relationship is evidence of de facto control. This argument is bolstered by the fact that Jeffrey submitted to International weekly reports.

The plaintiff lists additional factors:

Kies and Robert Church, the president and vice-president-secretary-treasurer, respectively, of EFS, received no compensation from EFS. Church drew his salary from Erico International, while Kies drew his compensation from Erico Europa and Erico International.

Robert Church conducts all negotiations with Ameritrust and other potential lenders on behalf of operating subsidiaries as well as Erico International and Erico Investment. Acting on behalf of Erico International and/or Erico Investment, Robert Church controlled not just the credit to the parent companies, but also to the subsidiaries.... Virtually all communication by Ameritrust concerning EFS's finances were directed to Robert Church or Sharon Bunch as Erico International or Erico Investment. Bank officials testified that they viewed Erico as a single, consolidated enterprise.... Erico International—"corporate"—controls and instructs the subsidiaries as to: submitting detailed monthly reports; annual capital budgets and five-year forecasts; nepotism; employee loans; purchasing insurance; approving bank accounts, loans and lease agreements; registered agents; patent and trademarks; consultants and auditors; standards for terms and conditions of sale; employee benefit programs; safety programs; quality control programs; purchasing programs; product recall; personal injury accidents; calculating I/O capacity; handling international inquiries; research and development.

Plaintiff's brief at pp. 83–85.

Further evidence that the parent was formulating policy for the subsidiary was an order prohibiting any Erico company

from doing business with South Africa "until further notice." Plaintiff's brief at p. 87. Examining all of the factors in this case reveals that the corporate parents exercised de facto control over EFS.

It should be noted that the court does not find persuasive plaintiff's argument that because the parents infused capital into the floundering EFS corporation the parents should be held liable on that basis. Nevertheless, the parents did exercise de facto control of the subsidiary.

Having found that International and Investment would prevail if the court were to utilize a strict "alter ego" test, it is apparent why the defendants have argued strenuously for such test as the only rule of decision in this case. The court, however, has previously explained that applying only one test would be incorrect. The court has also instructed that utilization of the "single employer" test and D.O.L. regulations is necessary. Although application of the facts to the various tests reveals substantial and disparate results, this disparity has crystallized for the court International's and Investment's liability. It is well established that the federal labor statutes enacted by Congress mandate that the court look to the economic reality of the parent-subsidiary relationship. *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403–04, 80 S.Ct. 441, 443–44, 4 L.Ed.2d 400 (1960).

In the case before the court, it is clear that International and Investment strictly adhered to corporate formalities, thereby surviving the alter ego test. Yet it was the parents who were manipulating the decision making of the subsidiary. The WARN Act was enacted by Congress to ameliorate the harm that allegedly took place in this case. The statute, like other federal labor statutes, has as its goal the protection of workers, and therefore, the single employer test and the factors enumerated in the D.O.L. regulations, which echo and expand the single employer test, are persuasive. The true wrongdoer should not escape liability simply because corporate formalities are observed. Therefore, the court finds that International and Investment are a single enterprise with EFS and can be held liable for the alleged WARN Act violation. This result will be bolstered by Part III of the court's opinion.

III. Direct Liability

The plaintiff asserts that not only can the parents be held liable for the alleged WARN Act violation based on the tests enumerated above, but also the parents can be held directly liable for making the decision to close the Moorestown facility. Because the court has determined in Part II, above, that the parents can be held liable, it is unnecessary for the court to reach the plaintiff's direct liability argument. The court, however, feels that it is appropriate to relate that a significant factor in its decision to hold the parents liable was the involvement of the parents in the decision to close EFS.

On August 24, 1990, the decision was made to shut the Moorestown facility. The defendants state that as directors of EFS, Kies and Church made that decision. Defendants' reply brief at p. 31. Kies and Church immediately reconstituted themselves as the directors of International and endorsed their own decision, made just minutes before. Next, they reconstituted themselves as the directors of Investment and approved their own decision. *See* Part A(iv) of the court's opinion. The decision to close the plant, a drain on Erico resources, was in the best interests of International and Investment, and therefore, EFS's directors, Kies and Robert Church, made the decision to close it. While the court applauds the corporations' strict adherence to corporate form, it is the function of this court under the federal labor statute at issue to assess the economic reality of the parent/subsidiary relationship. Therefore, because the court finds that the parents exercised de facto control of the operations of the subsidiary, International and Investment may be held liable for the alleged WARN Act violation of their subsidiary, EFS.

Accordingly, the motion for summary judgment brought by International and Investment is denied, and the plaintiff's cross-motion for partial summary judgment

as to the liability of International and Investment is granted.