UNITED MINE WORKERS OF AMERICA, DISTRICT 2; Local Union 1988, United Mine Workers of America; Local Union 1257, United Mine Workers of America; and Local Union 1848, United Mine Workers America, Plaintiffs,

v.

FLORENCE MINING COMPANY, a corporation; Quent, Inc., a corporation; Atlantic City Electric Company, a corporation; Baltimore Gas and Electric Company, a corporation; Delmarva Power & Light Company, a corporation; Metropolitan Edison Company, a corporation; Pennsylvania Power & Light Company, a corporation; Philadelphia Electric Company, a corporation; Potomac Electric Power Company, a corporation; Public Service Electric & Gas Company, a corporation; and UGI Corporation, a corporation, d/b/a Conemaugh Station Owners, Defendants.

Civ. A. No. 93–1058.

United States District Court,
W.D. Pennsylvania.

April 11, 1994.

Lloyd F. Engle, Jr., Kuhn, Engle & Stein, Pittsburgh, PA, for United Mine Workers of America, District 2, Local Union 1988, United Mine Workers of America, Local Union 1257, United Mine Workers of America, Local Union 1848, United Mine Workers of America.

Vincent J. Barbera, Barbera & Barbera, Somerset, PA, for Florence Min. Co., Quent, Inc.

Patrick W. Ritchey, Jack B. Cobetto, Karen E. Baillie, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Atlantic City Elec. Co., Baltimore Gas and Elec. Co., Delmarva Power & Light Co., Metropolitan Edison Co., Pennsylvania Power & Light Co., Philadelphia Elec. Co., Potomac Elec. Power Co., Public Service Elec. & Gas Co., UGI Corp.

## MEMORANDUM OPINION

BLOCH, District Judge.

Presently before this Court are the motions for summary judgment filed by defendants, Florence Mining Company and Quent, Inc. (together "defendant Mining Companies") and defendants, Atlantic City Electric Company, Baltimore Gas and Electric Company, Delmarva Power & Light Company, Metropolitan Edison Company, Pennsylvania Power & Light Company, Philadelphia Electric Company, Potomac Electric Power Company, Public Service Electric & Gas Company, and UGI Corporation (together "defendant Utility Companies"). For the reasons stated in this Opinion, defendants' respective motions will be granted.

### I. Background

The following are the undisputed facts of record. Defendant Florence Mining Company[1] (Florence Mining) had been engaged in the business of selling deep mined coal exclusively to the Conemaugh Power Generation Station (Conemaugh Station). The Conemaugh Station, which is owned by defendant Utility Companies, traditionally purchased the coal on a "cost plus contract basis" (the Cost Plus Contract).

---

1. In the caption of the complaint, plaintiffs refer to "Florence Mining Company." The Court will refer to this defendant as named by the plaintiffs. Various documents and corporate records, however, indicate that the company's name is "The Florence Mining Company."

Prior to October 30, 1991, Florence Mining was operated by Rochester & Pittsburgh Coal Company (Rochester & Pittsburgh). Between October 9, 1991 and October 30, 1991, defendant Utility Companies assigned to defendant Quent, Inc. (Quent) an existing stock option relating to the capital stock of Florence Mining (the Stock Option).[2]

On or about October 29, 1991, defendant Utility Companies canceled the Cost Plus Contract. On or about October 30, 1991, defendant Quent exercised the Stock Option and acquired control of defendant Florence Mining. On the same date as Quent's acquisition of Florence Mining, defendant Utility Companies entered into an operating agreement with Florence Mining (the Operating Agreement). In addition, defendant Utility Companies sent a letter dated October 30, 1991, to the Pennsylvania Secretary of Labor and Industry as well as the Chairman of the Pennsylvania Public Utility Commission (the Assurance Letter). Thus, through these transactions, ownership of Florence Mining was transferred from Rochester & Pittsburgh to Quent.

As a result of the cancellation of the Cost Plus Contract, defendant Florence Mining notified its employees on October 30, 1991, that it would be closing its mines and other facilities effective December 30, 1991. Florence Mining's mines and facilities included: (1) the Heshbon Mine, which produced the coal; (2) the Coal Preparation Facility, which cleaned coal for customer use; and (3) the Central Shop, which repaired equipment (collectively the Florence Mining Facilities).[3]

The record reveals that the Florence Mining Facilities have been shutdown twice. The first shutdown, which occurred in late October, 1991, was temporary and the second shutdown, which is the subject of this lawsuit, was permanent.

The first shutdown caused the employees of the Florence Mining Facilities to cease work on October 30, 1991. Florence Mining, however, continued to pay the employees through December 30, 1991.

Based upon lobbying by plaintiffs, defendant Utility Companies contractually agreed to purchase coal from Florence Mining for the Conemaugh Station at a fixed price of $35 per ton until December 31, 1992, with no provision for renewal (the New Supply Contract). With the New Supply Contract, Florence Mining began plans to reopen the facilities.

Defendant Mining Companies contend that, based upon the Unions' extensive involvement in the contract negotiations, the plaintiffs were on notice that the Florence Mining Facilities would be closed on December 31, 1992, absent another supply contract.[4]

After defendant Utility Companies agreed to the New Supply Contract, plaintiffs and Florence Mining negotiated a new collective bargaining agreement, entitled "The Florence Mining Company Closure Agreement of 1992" (the Closure Agreement). The Closure Agreement acknowledged that the New Supply Contract expired on December 31, 1992, and that, in order to meet the terms of that contract, certain production targets were required. On April 15, 1992, Florence Mining and defendant Utility Companies entered into a Termination Agreement, which superseded the Operating Agreement.

On April 20, 1992, the Union employees returned to work at the Central Shop. On June 22, 1992, the Union employees of the

---

**2.** According to the recitals of the October 30, 1991 Operating Agreement, the defendant Utility Companies "had an option to purchase all of the issued and outstanding stock" of Florence Mining pursuant to an Option Agreement dated October 1, 1984.

**3.** In addition to these three facilities, Florence Mining operated a mine called the "No. 2 Mine." Florence Mining's No. 2 Mine permanently ceased operations at the end of July, 1992, but plaintiffs have not alleged in this case that the closure of the No. 2 Mine violated the WARN Act.

**4.** In support of this contention, defendant Mining Companies cite a Memorandum of Understanding between Florence Mining and the United Mine Workers dated April 17, 1992, which acknowledged that "[t]he Generating Station has agreed to accept coal deliveries from Florence at a fixed price through 1992 and accept bids thereafter." ("FMC & QI S.J. Exhibit 3" (document No. 16)). In addition, they cite similar notices given to the employees at retraining sessions. ("FMC & QI S.J. Exhibits 14 and 15" (document No. 16)).

Coal Preparation Facility returned to work. Finally, on June 23, 1992, and June 24, 1992, the Union employees of the Heshbon Mine resumed work. It is undisputed that the Union employees at the Central Shop, the Coal Preparation Facility and the Heshbon Mine were represented by separate union locals.[5]

In addition, it is undisputed that the Central Shop, the Coal Preparation Facility and the Heshbon Mine were geographically separate. The Heshbon Mine was approximately ten miles by road from the Central Shop and approximately twelve miles by road from the Coal Preparation Facility. The Central Shop was approximately two miles by road from the Coal Preparation Facility. The Coal Preparation Facility processed both coal from the Heshbon Mine as well as from mines not owned by Florence Mining. Moreover, it is undisputed that more than fifty percent of the coal processed by the Coal Preparation Facility in 1992 was from outside sources. Similarly, the employees of the Central Shop repaired Florence Mining's equipment as well as that of other companies.

Each of the separate union locals constituted its own seniority unit. Each of the Florence Mining Facilities had its own employees and equipment.[6] Moreover, it is undisputed that the employees of the Heshbon Mine and the Coal Preparation Facility worked only at their respective facility. The Central Shop employees spent roughly ninety percent of their time working at the Shop facility. In addition, each had separate management and were viewed separately by the Federal Mine Safety and Health Administration.

The Heshbon Mine operated until December 30, 1992. The Coal Preparation facility continued to operate until December 31, 1992. The Central Shop continued to operate until February 8, 1993.

On June 28, 1993, the plaintiffs, as labor organizations and the collective bargaining representatives of the Union employees at the Florence Mining Facilities, filed the instant lawsuit alleging that defendants violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (Supp.1994) (the WARN Act).

The motion for summary judgment filed by defendant Mining Companies raises numerous challenges to plaintiffs' case. First, they contend that the WARN Act is inapplicable to the closure of the Heshbon Mine and the Coal Preparation Facility because 29 U.S.C. § 2103(1) exempts plant closings that are the result of the completion of a particular project or undertaking. Second, they argue that the closure of the Heshbon Mine and the Coal Preparation Facility did not qualify as either a "plant closing" or a "mass layoff" because it did not cause "employment loss" to "fifty or more employees" excluding "part-time employees."[7] Third, they challenge plaintiffs' standing to sue for damages on behalf of their individual members. Fourth, they contend that each of the Florence Mining Facilities constitutes a "single site of employment" and, therefore, even if part-time employees are included, the fifty-employee threshold cannot be met. Finally, they contend that they have provided appropriate notice under the terms of the WARN Act.

5. Specifically, Local 1257 represented the employees of the Coal Preparation Facility; Local 1848 represented the employees of the Central Shop; and Local 1988 represented the employees of the Heshbon Mine. All of these locals are members of District 2 of the United Mine Workers of America.

6. Plaintiffs allege that the panel rights of the Union employees resulted in cross-over employment between the various facilities. Plaintiffs' allegation, however, fails to create a genuine issue of fact for two reasons. First, although they present testimony generally describing the paneling process, they do not present any specific evidence that any particular employees moved

between the Heshbon Mine, the Coal Preparation Facility, or the Central Shop. Second, the evidence presented by plaintiffs demonstrates that the paneling process is only operational when employees are laid off and then recalled. It does not appear to operate when an employee is actively working at one of the facilities.

7. In related arguments, defendant Mining Companies contend that (1) certain employees should be excluded from the fifty-employee calculation because they did not suffer an employment loss during the relevant thirty-day period, and (2) certain employees who were on disability leave were not employees because they did not have a "reasonable expectation of recall."

Defendant Utility Companies raise two issues in their motion for summary judgment. First, they argue that they are not an "employer" within the meaning of the term under the WARN Act. Second, they contend that plaintiffs have failed to establish that they agreed to guarantee the payment of any WARN Act liability imposed upon defendant Mining Companies.

After briefly reviewing the standards applicable for resolving summary judgment motions, this Court will address defendants' dispositive arguments.

## II. Discussion

Summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *International Raw Materials, Ltd. v. Stauffer Chemical Corp.,* 898 F.2d 946, 949 (3d Cir.1990). Thus, where the non-moving party's evidence contradicts the movant's, the Court must accept the nonmovant's evidence as true. *Country Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1061 (3d Cir.1991).

The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that "the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Id.; Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The non-moving party "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). Rule 56 "enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of fact before the lengthy process of litigation continues.'" *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Moreover, "the unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Id.* If the non-moving party does produce contradictory evidence, then the "believability and weight of the *evidence*" remains the province of the finder of fact. *Big Apple,* 974 F.2d at 1363.

Preliminarily, this Court notes that '[t]he task of resolving the dispute over the meaning of [a statute] ... must begin with the language of the statute itself.' *United Steelworkers of America, AFL–CIO–CLC v. North Star Steel Co., Inc.,* 5 F.3d 39, 41 (3d Cir.1993) (*quoting United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994). "[I]f the statutory language is clear on its face" as it relates to the issue before the Court, then the "inquiry is generally complete and the plain language controls." *Id.* (citation omitted). *Accord Estate of Cowart v. Nicklos Drilling Co.,* ⸺ U.S. ⸺, ⸺, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

## A. Standing of Union plaintiffs

The Supreme Court has held that "Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus

permitting litigation by one 'who otherwise would be barred by prudential standing rules.'" *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (*quoting Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). In *Warth,* the Court explained the role of Congress in the area of standing:

> Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself even if it is an injury shared by a large class of other possible litigants. *But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.*

*Warth,* 422 U.S. at 501, 95 S.Ct. at 2206 (citations omitted) (emphasis added).

■ The "irreducible minimum" that must be established to satisfy the "Case or Controversy" requirement of Article III of the Constitution is as follows:

> (1) "injury in fact," by which [the Supreme Court] mean[s] an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) a causal relationship between the injury and the challenged action, by which [the Court] mean[s] that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court," and (3) a likelihood that the injury will be redressed by a favorable decision, by which [the Court] mean[s] that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative."

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993).

■ It is well settled that when an association seeks to assert the rights of its members, it must satisfy the following requirements: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 2 F.3d 493, 505 (3d Cir.1993).

The Supreme Court expressly recognized in *Warth* that "the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves" is subject to "exceptions, the most prominent of which is that Congress may remove it by statute." *Warth,* 422 U.S. at 509, 95 S.Ct. at 2211.

Later in the *Warth* opinion, the Supreme Court elaborated on the prudential limitations imposed on an association:

> As noted above, to justify any relief the association must show that it has suffered harm, or that one or more of its members are injured. *But, apart from this, whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.* If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

> *The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members.* No

award can therefore be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

*Warth,* 422 U.S. at 515–16, 95 S.Ct. at 2213–14 (emphasis added).

The Court of Appeals for the Third Circuit has determined that the third prong of the *Hunt* test paraphrases "a more detailed statement first made by the Court in *Warth* and repeated in later cases." *Hospital Council of Western Pennsylvania v. City of Pittsburgh,* 949 F.2d 83, 89 (3d Cir.1991). The more detailed statement cited by the Court of Appeals explained:

> [S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction.

*Id.* (*quoting Warth,* 422 U.S. at 511, 95 S.Ct. at 2212).

In the WARN Act, Congress provided as follows:

> *A person seeking to enforce such liability* [i.e., liability under 29 U.S.C. § 2104(a)(1) ],[8] *including a representative of employees ... may sue either for such person or for other persons similarly situated, or both,* in any district court of the United States for any district in which the violation is alleged to have occurred, or in which the employer transacts business.

29 U.S.C. § 2104(a)(5) (Supp.1994) (emphasis added). The term "representative" is de-

fined as an "exclusive representative of employees within the meaning of section 159(a) or 158(f) of this title or section 152 of Title 45." 29 U.S.C. § 2101(a)(4) (Supp.1994).

The defendant Mining Companies contend that the plaintiff Unions fail to satisfy the third prong of the *Hunt* test because the relief sought in this case, i.e., money damages, necessarily requires the participation of the individual members of the Unions. In support of their position, defendant Mining Companies cite two district court decisions from the Eastern District of Missouri.

In both of these cases, the United States District Court for the Eastern District of Missouri held that unions, as associations, lacked standing to sue for money damages on behalf of their members under the WARN Act because the requested relief required the participation of their members. *Amalgamated Clothing and Textile Workers Union v. Brown Group, Inc.,* No. 92–CV01678, 1993 WL 414718 (E.D.Mo. Sept. 27, 1993) (Jackson, J.); *United Food and Commercial Workers Union, Local 751 v. Brown Group, Inc.,* 820 F.Supp. 1192 (E.D.Mo.1993) (Filippine, C.J.). *See also Office of Professional Employees International Union Local 2, AFL–CIO v. FDIC,* 138 F.R.D. 325, 326 (D.D.C.1991) (union lacked standing to bring action seeking damages under WARN Act because it failed to satisfy the third prong of the *Hunt* test).

Generally, courts have refused to allow associations standing to seek monetary relief on behalf of their members. *See, e.g., United Union of Roofers, Waterproofers and Allied Trades No. 40 v. Insurance Corporation of America,* 919 F.2d 1398, 1400 (9th Cir.1990) (holding that association did not have standing to pursue claim on behalf of its members seeking money damages under payment bond issued by defendant); *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,* 806 F.2d 1093, 1095 (D.C.Cir.1986) (Bader Ginsburg, J.) (holding that association did not have standing to pursue claim on behalf of its members seeking money damages under

---

**8.** Under the WARN Act, "a federal court shall not have authority to enjoin a plant closing or

mass layoff." 29 U.S.C. § 2104(b) (Supp.1994).

Communications Act of 1934, 47 U.S.C. §§ 201(b), 202(a) (1982) (citations omitted)). These cases, however, did not involve claims under a federal statute specifically authorizing representative suits by associations.

■ Thus, because the third prong of the *Hunt* test is not a component of the "irreducible minimum" under the Constitution and because § 2104(a)(5) clearly evidences a congressional intent to authorize union suits on behalf of "aggrieved employees" for "such liability," this Court finds that the plaintiff Unions have standing to bring an action for damages under the WARN Act. Although the Supreme Court has determined that prudence generally counsels against such suits, it is within the power of Congress to authorize them.

## B. Requirements of the WARN Act

In general, the WARN Act requires that covered employers of 100 or more employees provide 60–days prior notice of "employment loss" caused by a "mass layoff" or "plant closing." 29 U.S.C. § 2102(a) (Supp.1994). A "plant closing" is defined as the "permanent or temporary shutdown of a *single site of employment* or one or more facilities or operating units within a *single site of employment,* if the shutdown results in an employment loss at the single site of employment during any 30–day period *for 50 or more employees* excluding part-time employees." 29 U.S.C. § 2101(a)(2) (Supp.1994) (emphasis added). A "mass layoff" is defined as follows:

A reduction in force which—

9. In *dicta,* the Court of Appeals for the Third Circuit has stated that "the statute explicitly excludes part-time employees from the defined term 'employment loss.'" *Moore v. Warehouse Club, Inc.,* 992 F.2d 27, 30 (3d Cir.1993). *Cf. Solberg v. Inline Corp.,* 740 F.Supp. 680, 685 (D.Minn.1990) ("While part-time employees are not counted in determining whether a mass layoff has occurred, if such a layoff does occur notice must be given to all 'affected employees.'"); 20 C.F.R. § 639.6(b) ("While part-time employees are not counted in determining whether plant closing or mass layoff thresholds are reached, such workers are due notice."). The definition of "employment loss" contained in § 2101(a)(6) does not expressly reference "part-time employees." In determining whether a "mass layoff" or "plant closing" has occurred,

(A) is *not* the result of a *plant closing;* and

(B) results in an employment loss at the single site of employment during any 30–day period for—

(i)(I) at least 33 percent of the employees (excluding any part-time employees); *and*

(II) *at least 50 employees* (excluding any part-time employees); or

(ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3) (Supp.1994) (emphasis added).

An "employment loss" is defined as:

(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) layoff exceeding six months, or (C) a reduction in hours of work of more than 50 percent during each month of any six-month period;

29 U.S.C. § 2101(a)(6) (Supp.1994).[9]

Section 2101(b)(2) provides two exclusions from the definition of "employment loss." 29 U.S.C. § 2101(b)(2) (Supp.1994). Neither of these exclusions is applicable to the instant case, however. In addition to the two § 2101(b)(2) exclusions, § 2103 exempts certain plant closings or mass layoffs. *See* 29 U.S.C. § 2103 (Supp.1994).

In *Moore v. Warehouse Club, Inc.,* 992 F.2d 27, 29 (3d Cir.1993), the Court of Appeals for the Third Circuit determined that "the ordinary, contemporary, common meaning" of "employment termination" is "[t]o discontinue the employment of" an employee.

however, the definitions of these terms do expressly exclude "part-time employees" from the numerical calculation necessary to determine whether an employer has caused one of these triggering events. *See* 29 U.S.C. §§ 2101(a)(2), (3). Because the issue before the Court of Appeals in *Moore* was whether the employer had caused a plant closing, i.e., whether the employer ordered the "permanent or temporary shutdown of a single site of employment" that resulted "in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding part-time employees," the issue of whether "part-time employees" who meet the definitions of "affected employee" and "aggrieved employee" are entitled to the requisite notice when a covered employer orders a triggering event is still unresolved in this Circuit.

Section 2102(a) requires covered employers to serve "written notice" to "each representative of the affected employees" or "if there is no such representative at that time, to each affected employee." 29 U.S.C. § 2102(a) (Supp.1994).[10] "Affected employees" are defined as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5) (Supp.1994).

Employer liability under the WARN Act is governed by § 2104(a)(1), which provides:

(1) *Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss* as a result of such closing or layoff for—

(A) backpay for each day of violation at a rate of compensation not less than the higher of—

(i) the average regular rate received by such employee during the last three years of the employee's employment; or

(ii) the final regular rate received by such employee; and

(B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

29 U.S.C. § 2104(a)(1) (Supp.1994) (emphasis added). Section 2104(a)(7) defines "aggrieved employee" as follows:

*an employee who has worked for the employer ordering the plant closing or mass layoff and who,* as a result of the failure by the employer to comply with section 2102 of this title *did not receive timely notice* either directly or through his or her representative as required by section 2102 of this title.

29 U.S.C. § 2104(a)(7) (Supp.1994) (emphasis added).

*1. Do the "Florence Mining Facilities" constitute a "single site of employment"?*

As can readily be seen from this statutory scheme, the definition of the term "single site of employment" is critical to a determination of whether a triggering event has occurred. The term "single site of employment," however, is not defined by the statute.

Courts faced with discerning the meaning of this term have turned to the interpretive regulations issued by the Department of Labor (DOL) for guidance. *See Carpenters District Council of New Orleans & Vicinity v. Dillard Department Stores, Inc.,* 15 F.3d 1275, 1289–90 (5th Cir.1994); *International Union, United Mine Workers v. Jim Walter Resources, Inc.,* 6 F.3d 722, 724–25 (11th Cir.1993); *Salyer v. Universal Concrete Products,* No. 90–187, 1990 WL 455190 (S.D.Ohio 1990), *aff'd.,* 940 F.2d 662 (6th Cir.1991).[11]

---

**10.** In addition, the WARN Act requires the employer to provide notice to the "State dislocated worker unit" and the "chief elected official of the unit of local government within which such closing or layoff is to occur." 29 U.S.C. § 2102(a)(2) (Supp.1994).

**11.** In *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), the Court stated:

If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

The Court further explained:

[It has] long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principal of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

*Id.* at 843–44, 104 S.Ct. at 2782–83 (citations omitted). *Cf. John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank,* — U.S. —, — and — n. 5, 114 S.Ct. 517, —

The DOL regulations issued pursuant to 29 U.S.C. § 2107(a) provide as follows:

(1) A single site of employment can refer to either a single or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

(2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be a single site of employment.

(3) *Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purposes, and share the same staff and equipment.* An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) *Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site.* For example, assembly plants which are located on opposite sides of town and which are managed by a single employer may be considered separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate work forces are considered separate sites of employment.

\*    \*    \*    \*    \*    \*

(8) The term "single site of employment" may also apply to unusual organizational situations where the above criteria do not reasonably apply.

20 C.F.R. § 639.3(i) (1993) (emphasis added).[12] The DOL regulations are consistent with the House Conference Report, which explained:

The Conference Agreement strikes all references to "place of employment" and replaces them with "single site of employment." *This change is intended to clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met.* For example, an automobile assembly plant on the East Side of town and an assembly plant on the West Side of town ordinarily would be two separate "sites of employment." On the other hand, an assembly plant on the East Side of town that happens to extend to both sides of a public street is not two distinct "sites."

H.R.Conf.Rep. No. 100–576, 100th Cong., 2d Sess. 1045 (1988), *reprinted in* 1988 USCCAN 1547, 2078, 2079 (emphasis added).

Defendant Mining Companies argue that the Heshbon Mine, the Coal Preparation Facility and the Central Shop do not constitute a "single site of employment."[13]

Plaintiffs admit that the Florence Mining Facilities are not contiguous, but they contend that "[t]he thread which ties them all together is the singular operational purpose and the unbroken chain of essential elements which accomplish that purpose." (Plaintiffs' brief (document No. 23) at 29). Specifically, they argue that each of the facilities is "essential to and function together for a singular operational purpose[,] i.e., to get coal out of the ground and into the ... power plant." (Plaintiff's brief (document No. 23) at 33).

and —— n. 5, 126 L.Ed.2d 524 (1993). Thus, this Court like others must defer to an agency's interpretation if it is reasonable. *Conoco, Inc. v. Skinner,* 970 F.2d 1206, 1223 (3d Cir.1992).

**12.** "The term 'facility' refers to a building or buildings. The term 'operating unit' refers to an organizationally or operationally distinct product, operation, or specific work function within

or across facilities at the single site." 20 C.F.R. § 639.3(j) (1993).

**13.** Defendant Mining Companies also contend that Florence Mining's No. 2 Mine is a separate site of employment. The Court need not address this contention because plaintiffs have not asserted any claim with respect to the closure of the No. 2 Mine.

In addition, plaintiffs cite the employees' "panel rights" under the National Bituminous Coal Wage Agreement of 1988 (the 1988 NBCWA), which they allege "provided means for the cross over of employees between parts of the integrated continuous process." *Id.* at 30.[14] Plaintiffs have presented no evidence that any particular employees rotated or moved from one of the facilities to another.

This Court finds the decisions in *Jim Walter Resources* and *Salyer* to be particularly persuasive. In both of these cases, the courts emphasized that the particular facilities were operated by separate management and with separate workforces. *Jim Walter Resources,* 6 F.3d at 725; *Salyer,* 940 F.2d 662, 1991 WL 135532, at *3 (6th Cir.1991).

■ Assuming *arguendo* that these non-contiguous sites are in "reasonable geographic proximity," the evidence fails to establish that these sites "share the same staff and equipment." *See* 20 C.F.R. § 639.3(i)(2). Therefore, this Court finds that the undisputed facts of record establish that the Florence Mining Facilities were *not* a "single site of employment."

*2. Did 50 employees excluding "part-time employees" suffer an "employment loss" during "any 30–day period"?*

Even if the Court accepts the plaintiffs' argument that the Florence Mining Facilities constituted a "single site of employment," the plaintiffs must establish that the plant closing caused 50 or more employees, excluding "part-time employees," to suffer "employment loss."

*a. Were the employees of the Florence Mining Facilities "part-time employees"?*

A "part-time employee" is defined as "an employee ... who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required." 29 U.S.C. § 2101(a)(8) (Supp.1994). The Court of Appeals for the Third Circuit has equated the term "employed" with the term "worked." *Moore,* 992 F.2d at 30–32.

Similarly, the Conference Agreement provided as follows:

The Senate Amendment defines a "part-time employee" as one who is hired to *work* an average of fewer than fifteen hours per week. It also defines a "seasonal employee" as one who is hired for a period not to exceed three months per year to do *work* that is seasonal in nature. The Conference Agreement combines these concepts into a single definition of "part-time" employee, which includes employees who *work* fewer than twenty hours per week or who have *worked* fewer than six months in the twelve-month period prior to the point at which the employer is required to serve notice. The definition of "seasonal employee" is therefore eliminated.

H.R.Conf.Rep. No. 100–576, 100th Cong., 2d Sess. 1045 (1988), *reprinted in* 1988 USCCAN. 2078, 2080 (emphasis added).

The DOL regulations are also consistent:

The term "part-time" employee means an employee who is employed for an average of fewer than twenty hours per week or who has been employed for fewer than six of the twelve months preceding the date on which notice is required, including workers who work full time.

20 C.F.R. § 639.3(h) (1993).

The undisputed facts of this case establish that the employees of each of the facilities stopped work on October 30, 1991. The plaintiffs contend that the plant closing relevant to this lawsuit occurred on or about December 30, 1992. Thus, according to plaintiffs' theory, defendant Mining Companies were required to give notice on October 30, 1992.

■ Because it is undisputed that the employees of the Heshbon Mine as well as the

---

14. The 1988 NBCWA is an agreement between the United Mine Workers of America and the Bituminous Coal Operators Association (BCOA). Florence Mining was a member of the BCOA and thus a signatory to the 1988 NBCWA. With regard to panel rights, the 1988 NBCWA provides "[e]mployees who are idle because of a reduction in the working force shall be placed on a panel from which they shall be returned to employment on the basis of seniority.... A panel member shall be considered for every job which he has listed on his layoff form as one to which he wishes to be recalled." (1988 NBCWA at 13, § D).

Coal Preparation Facility did not work six of the twelve months preceding October 30, 1992, these employees are deemed "part-time employees" under the terms of the statute and excluded from the calculation of whether fifty employees suffered employment loss. Excluding these employees, the record reveals only four employees from the Central Shop who could be counted towards the fifty-employee threshold.

*b. Did fifty employees suffer employment loss?*

Even if the Court accepted plaintiffs' argument that the Florence Mining Facilities constituted a "single site of employment" and their argument that the employees at these facilities were *not* "part-time employees," they still have failed to present *evidence* documenting that *fifty* employees suffered "employment loss" during the relevant thirty-day period. *Cf. Moore v. Warehouse Club, Inc.,* No. 90–1869, 1992 WL 318560, at *2 (W.D.Pa. July 27, 1992) (*citing* defendants' answer to interrogatory identifying number of employees), *aff'd.,* 992 F.2d 27 (3d Cir.1993). In their brief, plaintiffs allege that the Florence Mining Facilities "resumed full production with more than 100 employees." (Plaintiffs' brief (document No. 23) at 14).[15] The only evidence produced by plaintiffs on this issue are excerpts from four depositions of former employees of Florence Mining. The deposition of James Heffelfinger establishes that there were only four employees who worked in the Central Shop: himself, Jim Henigan, Tim Ross, and a shop foreman named "Mr. Gelson." In addition to these employees, the Court has before it the deposition of Bradley Fairbanks, who worked in the Coal Preparation facility, and John Krause, who worked in the Heshbon Mine. In addition to these employees who were working at the time of the closure, plaintiffs

have presented deposition testimony of Barry Custer and Cleaon Keller, who had worked at the Heshbon but were on disability leave at the time of the closure. Thus, giving plaintiffs the benefit of any doubt as to the status of any of these employees, they have only provided evidence that eight employees suffered "employment loss" as a result of the "plant closing."

In addition to plaintiffs' evidence, the Court has before it evidence supplied by defendant Mining Companies. Specifically, defendant Mining Companies have provided two affidavits by Todd Spahn, the Vice President of Administration of Florence Mining, which established that there were eleven union and seventeen management employees at the Heshbon Mine; that the highest number of employees working at the Coal Preparation Facility between November 30, 1992 and January 30, 1993, was fourteen; and that the highest number of employees working at the Central Shop between November 30, 1992 and March 10, 1993, was four.[16] (FMC & QI's S.J. Exhibit 13 (document No. 16); FMC & QI's S.J. Exhibit 23 (document No. 30)). Spahn identifies the same employees as Heffelfinger as working at the Central Shop. The eleven employees identified by Spahn as working at the Heshbon Mine do not include Krause, Custer, or Keller. Spahn does not specifically name the fourteen employees who worked at the Coal Preparation Facility but, as a maximum, it appears to include Bradley Fairbanks. Thus, even assuming that the facilities were a single site of employment and that the employees are not excluded as part-time employees, the evidence before this Court only establishes the existence of forty-nine "employees," who arguably suffered employment

**15.** In addition to this allegation, plaintiffs allege in their complaint that defendants employed 120 employees at the Florence Mining Facilities and that the closure of these facilities collectively resulted in "employment loss" for "more than 50 employees." (Complaint at ¶¶ 7, 19).

**16.** The Court notes that defendant Mining Companies dispute whether the "employment loss" suffered by all these employees occurred during the relevant "thirty-day period." Specifically, the first Spahn affidavit indicates that eight of

the eleven Heshbon Mine employees continued to work until February 5, 1993, that an additional Heshbon Mine employee worked until February 15, 1993, and the final two employees worked until March 12, 1993. In addition, the first Spahn affidavit indicates that three of the employees from the Central Shop worked until February 8, 1993. This affidavit also identifies a member of the "construction crew" who worked until December 30, *1993.*

loss.[17] Whether this is the true number or not, this is the number of employees confirmed by the *evidence*.

Accordingly, because this Court finds that the undisputed facts of this case fail to establish that defendant Mining Companies effected a "plant closing" or a "mass layoff" within the meaning of the WARN Act, this Court will grant defendant Mining Companies' motion for summary judgment. Because the Court is resolving this motion on the above grounds, the Court need not address defendant Mining Companies' remaining arguments.

*3. Do the defendant Utility Companies constitute an "employer" of the employees at the Florence Mining Facilities?*

Section 2101(a) provides as follows:

As used in this chapter—

(1) the term "employer" means *any business enterprise* that employs—

(a) 100 or more employees, excluding part-time employees; or

(b) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime);

29 U.S.C. § 2101(a) (Supp.1994) (emphasis added).

In discussing the definition of "employer," the House Conference Report stated as follows:

The Conference Agreement retains the Senate Amendment language that the term "employer" means a business enterprise. The conferees intend that a "business enterprise" be deemed synonymous with the term company, firm or business, and that it consists of one or more sites of employment under common ownership or control. For example, General Motors has dozens of automobile plants throughout the country. Each plant would be considered a site of employment, but as provided in the Bill, there is only one "employer"— General Motors.

H.R.Conf.Rep. No. 100–576, 100th Cong., 2d Sess. 1046 (1988), *reprinted in* 1988 USCCAN 2078, 2079.

The DOL regulations also explain the definition of "employer" under the WARN Act:

Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) *de facto* exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) dependency of operations.

20 C.F.R. § 639.3(a)(2) (1993).

Subsequent to the issuance of these interpretive regulations, the DOL issued an Analysis of Final Rule and Comments:

The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition for these terms for WARN purposes; *the definition is intended only to summarize existing law that has developed under state corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA).* The Department does not believe that there is any reason to attempt to create new law in this area, especially for WARN purposes, when relevant concepts of state and federal law adequately cover the issue. *Thus, no change has been made in the definition. Similarly, the regulation is not intended to foreclose any application of existing law or to identify the source of legal authority for making determinations of whether related entities are separate.*

50 Fed.Reg. 16,045 (Apr. 20, 1989) (emphasis added).

In the instant case, plaintiffs do not allege that defendant Utility Companies are the alter egos of defendant Mining Companies. Plaintiffs do, however, allege that all of these defendants formed a "single integrated enterprise."

---

**17.** As indicated above, the record does disclose the existence of one additional worker. However, this employee continued to work for an entire year after the alleged plant closing.

Under the "single-employer" or "single-enterprise" test, the issue is whether nominally separate entities are, "in reality, only *one integrated enterprise.*" *NLRB v. Browning–Ferris Industries, Inc.,* 691 F.2d 1117, 1122 (3d Cir.1982) (emphasis in original).[18] In making this determination, this Court must consider the following factors: (1) common ownership, (2) common management, (3) centralized control of labor relations, and (4) functional integration of operations. *Id.* The Court of Appeals for the Third Circuit explained that "the 'single employer' standard is relevant to the determination that 'separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise.'" *Id.* (*quoting NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S.Ct. 441, 443, 4 L.Ed.2d 400 (1960)). "'Single employer' status ultimately depends on all circumstances of the case and is characterized as an absence of an arm's-length relationship found among unintegrated companies." *Id.*

In evaluating the definition of "employer" under the WARN Act, the District Court in *Local 397, International Union of Electronic, Electrical Salaried Machine and Furniture Workers, AFL–CIO v. Midwest Fasteners, Inc.,* 779 F.Supp. 788, 796–98 (D.N.J. 1992), applied a three-part test that included (1) analysis under the alter ego doctrine, (2) analysis under the single employer doctrine, and (3) analysis under the DOL regulations.[19]

The District Court in *Midwest Fasteners* recognized that the single-employer theory was primarily used in cases arising under the National Labor Relations Act, but found that "the theme of the standard, which is to place less emphasis on corporate form and assess the 'economic reality' of the corporate relationship, is the pervasive theme in cases under other federal labor statutes, namely, ERISA and the FLSA." *Id.* at 796. Applying this test, the District Court found that the corporation's parent and grandparent corporations comprised a "single enterprise" with the wholly-owned subsidiary. *Id.* at 800. Specifically, the District Court found that the defendants did exercise a "substantial degree of control" over the subsidiary and that the "economic reality" was that the directors of the parent and grandparent corporations "made the decision" to order the plant closing. *Id.* at 799.

In *Wholesale and Retail Food Distribution Local 63 v. Santa Fe Terminal Services, Inc.,* 826 F.Supp. 326, 335 (C.D.Cal.1993), the District Court followed the analysis proffered by the *Midwest Fasteners* Court, but found that the defendants did not constitute a "single employer."

Because defendant Utility Companies do not contest the application of the "single-enterprise" theory in the context of the WARN Act,[20] this Court will apply *arguendo*

---

**18.** In *Browning–Ferris,* the Court of Appeals explained the distinction between liability under a "single enterprise" theory and a "joint employer" theory under the NLRA. *Browning–Ferris,* 691 F.2d at 1122. In contrast to the single-enterprise theory, the "'joint employer' concept does not depend upon the existence of a single integrated enterprise and therefore ... [the] four factor standard [of the single-enterprise test] is inapposite." *Id.* "Rather, a finding that companies are 'joint employers' assumes in the first instance that companies are 'what they appear to be'—independent legal entities that have merely 'historically chosen to handle jointly ... important aspects of their employer-employee relationship.'" *Id.* (citation omitted). *See also Holyoke Visiting Nurses Association v. NLRB,* 11 F.3d 302, 306 (1st Cir.1993). In the instant case, plaintiffs do not allege that defendants acted as a "joint employer."

**19.** The District Court in *Midwest Fasteners* concluded that "[t]he statute, like other federal labor statutes, has as its goal the protection of workers

and, therefore, the single employer test and the factors enumerated in the D.O.L. regulations, which echo and expand the single employer test, are persuasive." *Midwest Fasteners,* 779 F.Supp. at 798–99. It further declared that "[t]he true wrongdoer should not escape liability simply because corporate formalities are observed." *Id.* at 800.

**20.** Defendant Utility Companies argue for the application of the literal meaning of the statute's language. (*See* defendant Utility Companies' memorandum at 10 n. 21 (*citing Christopher v. Davis Beach Co.,* 15 F.3d 38 (3d Cir.1994))). However, defendants fail to argue that the definition of "employer" under the WARN Act excludes liability based upon a "single enterprise" theory. The Court in *Davis Beach* held that defendant lenders did not operate the resort for the period of time required by the Act, i.e., "at least one year." *Id.* at 41 (*citing* 24 V.I.C. § 471(4)). Although the Court of Appeals refused to "expand" the statutory definition in light

the test adopted by the Courts in *Midwest Fasteners* and *Santa Fe Terminal*. Accordingly, this Court will consider the evidence produced by plaintiffs in support of their "single enterprise" theory of liability.

First, plaintiffs rely on the Assurance Letter dated October 30, 1991. The Assurance Letter, however, "assured" only "that provisions have been made so that the Florence Mining Company (FMC) will be able to fulfill its contractual obligations under the National Bituminous Coal Wage Agreement of 1988 (1988 NBCWA) after ownership of FMC has been transferred from the Rochester & Pittsburgh Coal Company to Quent, Inc."[21]

Second, plaintiffs cite the Operating Agreement between Florence Mining and defendant Utility Companies. Plaintiffs, however, completely ignore the Termination Agreement, which provided, *inter alia,* that: (1) it superseded the prior Operating Agreement; (2) defendant Utility Companies would make a final payment of all obligations under the prior Operating Agreement; (3) Florence Mining acknowledges that defendant Utility Companies had fully performed their obligations under all predecessor agreements, including the Operating Agreement; (4) Florence Mining releases defendant Utility Companies from any further obligations; (5) Florence Mining can continue mining and processing coal as well as its delivery operations as it shall determine in "its sole and absolute discretion;" (6) Florence Mining shall "be and remain in all respects a contractor independent of the [defendant Utility Companies] and not subject to the direction and control of the [defendant Utility Companies], and have the sole right to manage, hire, fire and direct its work force and all its personnel, and to determine and manage the use of its machinery, equipment and supplies, the mines, its coal reserves, and all its other properties, all as Florence's management

shall, in its sole discretion, deem to be most advantageous in managing its affairs;" (7) defendant Utility Companies canceled all of their rights under the earlier Stock Option Agreements; and (8) the Termination Agreement "shall not" create any rights in any third parties. (Document No. 19 (Exhibit B)).

Inexplicably, plaintiffs appear to argue that the Operating Agreement was in effect until December 31, 1993, even though they acknowledge that the Termination Agreement superseded the previous agreement. (Plaintiffs' brief at 12). In fact, plaintiffs acknowledge that "the ultimate control" allegedly exercised by defendant Utility Companies "is not yet quite clear" to them. (Plaintiffs' brief (document No. 22) at 17). Yet they allege that the "entire process, from October 1, 1991 through December 30, 1992 was a grand scheme of duplicity, misinformation and failure to inform." (Plaintiffs' brief (document No. 22) at 15).

■ Plaintiffs have not presented any evidence that defendant Utility Companies owned Florence Mining or Quent during the relevant time period. Nor have they shown that these companies shared management or personnel. In addition, if there ever existed *"de facto"* control of Florence Mining by defendant Utility Companies, it appears clear that the control ended when the parties terminated the Operating Agreement on April 15, 1992. Plaintiffs fail to persuade this Court that the definition of "employer" under the WARN Act was intended to include a customer of an acknowledged employer. Therefore, this Court will grant defendant Utility Companies' motion for summary judgment.

---

of its clear and unambiguous time requirement, application of the Court's interpretive principle arguably counsels in favor of the "single enterprise" theory because the WARN Act refers to an "employer" as any "business *enterprise*." *See* 29 U.S.C. § 2101(a) (Supp.1994).

**21.** Plaintiffs also argue that defendant Utility Companies became the "guarantors of the contractual and statutory obligations of the employ-

er" by issuing this Assurance Letter. (Complaint at ¶ 9). Defendant Utility Companies correctly point out that, even if this letter could be construed as a guarantee or surety, it would only extend by its terms to "contractual obligations" under the 1988 NBCWA. Although the Court doubts that the Assurance Letter "guaranteed" the payment of these contractual obligations, the Court need not reach this issue because it plainly does not extend to "statutory liability."