UNITED PAPERWORKERS INTERNA-
TIONAL UNION, AFL–CIO, CLC, and
United Paperworkers International Un-
ion, AFL–CIO, CLC, Local 408,

v.

ALDEN CORRUGATED CONTAINER
CORPORATION, Bates Corrugated Box
Corporation, Scales Lane Realty Corpo-
ration, Harman Realty & Trading Cor-
poration, Corrugated Management Ser-
vices Corporation, and Alden Holdings
Corporation.

UNITED PAPERWORKERS
INTERNATIONAL UNION
LOCAL 996,

v.

BATES CORRUGATED BOX
CORPORATION

v.

FIRST FEDERAL SAVINGS
BANK OF AMERICA.

Civ. A. Nos. 91–11763–WGY,
91–10327–WGY.

United States District Court,
D. Massachusetts.

Sept. 6, 1995.

428

Thomas M. Bovenzi, Bovenzi, Moriarty & Blackburn, Springfield, MA, for plaintiff United Paperworkers International Union, Local 996.

Robert M. Novack, Sherwin, Gottlieb & Lowenstein, Fall River, MA, for defendant Bates Corrugated Box Corp.

Ned F. Tentindo, First National Bank of Boston Law Office, Boston, MA, Peter G. Collias, Fall River, MA, for trustee First National Bank of Boston, as trustee in the above-entitled matter.

## *OPINION*

COLLINGS, United States Magistrate Judge.

### *I. INTRODUCTION*

These actions arise out of the 1991 closings of two corrugated cardboard product manufacturing plants. Consolidated for trial,[1] the two cases are brought under the Worker Adjustment and Retraining Act ("WARN"), 29 U.S.C. § 2101, *et seq.* (1994). The thrust of the plaintiffs' claim is that the defendants failed to provide the affected workers with the sixty days written notification of the plant closings mandated by the WARN Act and, consequently, are liable to the employees for back pay and fringe benefits for each day that the notice was required but not forthcoming.

During the course of pretrial conferences, it became apparent that counsel for all parties shared the view that the historical facts

---

1. With the parties' consent, both cases have been referred to the undersigned for all purposes in- cluding trial and the entry of judgment pursuant to 28 U.S.C. § 636(c).

underlying each of the cases were undisputed. The point at which the parties diverge is with respect to the construction to be given those facts vis-a-vis the interpretation and applicability of the provisions of the WARN Act. In the interest of judicial economy, it was agreed that the cases would be tried to the Court based upon a stipulation of uncontested facts (# 52) and memoranda of law (# # 53, 56, 57, 58). With the requisite submissions having been filed, and oral argument having been heard, the record is now complete. The following constitutes the Court's findings of fact and conclusions of law thereon pursuant to Rule 52, Fed. R.Civ.P.

## II. THE FACTS

### A. The Parties

Plaintiffs United Paperworkers International Union, AFL–CIO, CLC and United Paperworkers International Union, AFL–CIO, CLC, Local 408 (hereinafter collectively the "Union") together are the sole collective bargaining agent for their members who worked at a corrugated cardboard products manufacturing plant owned by defendant Harman Realty & Trust Corp. (hereinafter "Harman") and located at 1 Church Street, New Bedford, Massachusetts (hereinafter the "Alden Plant") (Stipulations of Uncontested Facts, # 52[a], [tt] ) (hereinafter "Stip.") The Alden Plant was leased to, and operated by, defendant Alden Corrugated Container Corporation (hereinafter "Alden"), a Massachusetts corporation with a principal place of business in New Bedford, Massachusetts. (Stip. [iiii], [kkkk] ) Defendant Alden Holdings Corp. (hereinafter "Alden Holdings"), a holding company that does not engage in any business activities, owns one hundred percent (100%) of the stock of Alden. (Stip. [n], [vv] ) Defendant Corrugated Management Services Corp. (hereinafter "Corrugated") paid the salary of one Stanley Jacobson during the time that Mr. Jacobson served both as the executive vice president of Alden and the president of defendant Bates

Corrugated Box Corp. (hereinafter "Bates"). (Stip. [vv], [aaaa] )

Plaintiff United Paperworkers International Union Local 996[2] (hereinafter "Local 996"), a duly organized union, is the bargaining unit representing certain of the former employees of Bates, a Massachusetts corporation with a principal place of business in Townsend, Massachusetts. (Stip. [mmm], [iiii] ) In addition to its union members, for purposes of this litigation Local 996 is also the representative of eleven non-union Bates employees. (Stip. [vvvv] ) Bates, a full-line corrugating manufacturer, operated its business out of a plant in Townsend, Massachusetts (hereinafter the "Bates Plant") that was owned by, and leased from, defendant Scales Lane Realty Corp. (hereinafter "Scales"). (Stip. [ppp], [kkkk] ) Alden Holdings owns ninety-one percent (91%) of the common stock of Bates. (Stip. [o] )

### B. The Events

Alden and Bates, which were physically located approximately ninety (90) miles apart, both engaged in the corrugated cardboard product manufacturing business albeit at different levels of the industry. (Stip. [s], [jjjj] ) Alden manufactured corrugated sheets, the raw material out of which corrugated products were produced; Bates, a full-line corrugating operation, manufactured corrugated boxes for retail sales. (Stip. [ppp], [jjjj] )

For the most part, Alden and Bates had their own respective employees, used separate equipment and serviced their own individual customers. (Stip. [jjjj] ) On some occasions, the two corporations competed with each other, while at other times they sold products to each other. (Stip. [t], [jjjj] ) Alden did not have any ownership interest in Bates' assets, nor did Bates own any of Alden's assets. (Stip. [jjjj] ) As noted earlier, Alden Holdings owned most if not all of the common stock of the two corporations. (Stip. [n], [o] ) Moreover, certain individuals were simultaneously officers, directors and

---

**2.** Throughout the Stipulations of Uncontested Facts (# 52), plaintiff United Paperworkers International Union Local 996 is referenced as "Local

966". That this designation constitutes a typographical error has been confirmed by counsel for Local 996.

part owners of both corporations. (Stip. [y], [aa], [jjjj])

The fiscal fortunes of Alden and Bates mirrored the overall economic malaise and depression experienced in New England during the late eighties and early nineties. (Stip. [llll]) In 1987, the two corporations reaped a meager profit. (Stip. [llll]) However, beginning in 1988 and continuing through 1990, Alden and Bates lost substantial and increasing amounts of money. (Stip. [llll])

By unanimous consent of its directors, in 1987 Alden Holdings established a two million eight hundred thousand dollar ($2,800,000.00) line of credit with the Bank of Boston for the use and benefit of Alden and Bates. (Stip. [r], [ss], Exh. D) Prior to May of 1990, presumably pursuant to the line of credit granted to Alden Holdings, Alden and Bates each had loans from the Bank of Boston. (Stip. [ss], [mmmm]) The two loans were not cross-collateralized: the loan to Alden was secured only by Alden assets and the loan to Bates was secured solely by Bates assets. (Stip. [mmmm]) As Alden and Bates continued to falter financially, the Bank of Boston transferred both of their loans into its "workout" department. (Stip. [eeee], [mmmm])

In May, 1990, Alden and Bates underwent an extensive reorganization. (Stip. [mmmm]) Alden was converted to a corrugated sheets only manufacturing operation; Bates' manufacturing capacity was significantly expanded in order to handle all of the finished box business previously generated at Alden. (Stip. [nnnn], [tttt]) Consequent to the restructuring and conversion, Alden, which then employed more than one hundred (100) people, laid off approximately seventy-five (75) employees after giving those workers notice pursuant to the WARN Act. (Stip. [nnnn]) In addition, several employees of Alden, including the plant manager, Edward Barber, and five or six salespeople, were offered and accepted positions at the Bates Plant. (Stip. [bbbb], [cccc])

After its box business was transferred to Bates, Alden authorized Bates to assume the trade name of "Alden Bates Container" in order to permit Bates to take advantage of the Alden name in the retail market. (Stip. [pp], [oooo]) This authorization was gratuitous; Alden received no compensation from Bates. (Stip. [pp]) At the same time, Alden began to operate under the trade name "Corrsheet" so as to avoid confusion, reflect its new status and maintain the distinction between the two corporate entities. (Stip. [qq], [oooo])

Coincident with the business reorganization in May of 1990, the Bank of Boston agreed to restructure the Alden and Bates loans and to extend a one million eight hundred thousand dollar ($1,800,000.00) line of credit to the two corporations. (Stip. [mmmm]) However, as a condition to the restructuring arrangement, the bank was resolute in demanding that the loans be cross-collateralized. (Stip. [mmmm]) Thus, the amounts loaned to Alden and Bates were secured by the property of Alden, Bates and Scales, each of whom became parties to cross-collateralization agreements with the Bank of Boston. (Stip. [hh], [ii], [mmmm], Exh. D, documents A–K) [3]

In September, 1990, Alden, Bates and Alden Holdings convened a meeting with their major paper suppliers who were creditors of Alden and Bates. (Stip. [jj], [kk]) During the course of the meeting, the representatives of Alden, Bates and Alden Holdings, i.e., Stanley Jacobson, Edward Barber, Benjamin Gottlieb, Walter Zuckerman, Danny Vaz and Don Perry, shared information concerning the business and financial affairs of Alden and Bates with the paper suppliers. (Stip. [kk], [ll]) The upshot of the meeting was a decision by the attending creditors to supply Alden and Bates with paper exclusively on a cash-on-delivery basis. (Stip. [gggg], [oooo]) At the same meeting, Alden and

---

3. In Stipulation of Fact [hh], it is stated "Alden, Bates, Scales and Harman were parties to various cross collateralization agreements and guarantees which were part of a restructure loan agreement with the Bank of Boston." The text of stipulation [mmmm] is somewhat contradictory, to wit, "[a]lthough the property of Scales was, the property of Harman was not a part of the cross-collateralization." There is no support in the documentary evidence upon which to base a finding that Harman executed, or was a party to, a cross-collateralization agreement with the Bank of Boston. (Exh. D, documents A–K).

Bates coordinated some of their paper purchases from the paper suppliers. (Stip. [nn])

As of September 11, 1990, Bates had at least one hundred twenty-three (123) employees working at the Bates Plant, ninety-seven (97) of whom were members of Local 996. (Stip. [sss]) On that date, Bates laid off thirty (30) members of Local 996. (Stip. [ttt]) A decision was made by Bates in October or November, 1990, to endeavor to sell its operation. (Stip. [dddd]) At that time, Bates was in a "workout" mode with the Bank of Boston. (Stip. [eeee]) With no advance written notice to the union, Bates laid off another twenty-four (24) members of Local 996 on November 30, 1990. (Stip. [uuu], [vvv])

The expansion of the manufacturing operation at Bates that began in May, 1990, ultimately resulted in an operational and financial debacle. (Stip. [tttt]) In terms of both product quantity and quality, Bates was never able effectively to manage or produce all of the box business previously handled at Alden. (Stip. [tttt]) Losses continued to accrue on a monthly basis. (Stip. [tttt]) On January 15, 1991, loan officers at the Bank of Boston advised Bates management that with the exception of minimal shutdown payroll expenses, all funding would be terminated as of the following Friday. (Stip. [tttt])

On January 16, 1991, Benjamin Gottlieb, a director of Bates, personally appeared at the Bates Plant to inform all employees that the entire Bates manufacturing operation would cease on Friday, January 18, 1991. (Stip. [tttt]) The Bates Plant did in fact close on January 18, 1991. (Stip. [i], [qqq], [www]) On that date, Bates laid off forty-three (43) members of Local 996 as well as twenty-seven (27) non-union employees.[4] (Stip. [fff], [www]) Neither Local 996, which was a party to a collective bargaining agreement with

Bates, nor any of its employees ever received written notification of the plant closing from Bates. (Stip. [lll], [ooo], [rrr])

Until the Bank of Boston called the loan, Bates had expected that its manufacturing operation could be sustained. (Stip. [tttt]) Encumbered by the withdrawal of financing coupled with the dismal economic prognosis for New England, Bates could generate no interest among, or offers from, potential purchasers of its business. (Stip. [tttt])

Following the reorganization and conversion in May, 1990, with the exception of the several million dollars owed to its paper suppliers, Alden was current with all its bills and successfully broadening its customer base. (Stip. [oooo]) However, the September, 1990 decision by its paper suppliers to place Alden on a C.O.D. basis impeded Alden's ability to receive raw materials and manufacture its product in a competitive manner. (Stip. [oooo]) Alden believed that, absent the cash flow problem caused by the C.O.D. requirement, it would have returned to profitability once the overall economic climate improved. (Stip. [oooo])

In the wake of extremely poor year end figures for 1990, on January 15, 1991, the Bank of Boston called its loan to Alden. (Stip. [pppp]) At the same time, however, the bank agreed that Alden could continue its operation on a week-to-week basis so as to afford Alden the opportunity to find a purchaser for its business. (Stip. [pppp]) As a condition to the arrangement, the bank was to receive weekly balance sheets and projections from Alden. (Stip. [qqqq])

Alden management believed that a new owner without the burden of credit problems could operate its business profitably. (Stip. [pppp]) Although Alden located an interested buyer from Philadelphia, on February 19, 1991, that prospective purchaser advised Alden that its bank would not finance the ac-

---

4. The names, hourly rates, pay and benefits for a sixty-day period and lay-off dates of the members of Local 996 are set forth in Exhibit B. (Stip. [xxxx]) The names, pay and benefits for a sixty-day period for the eleven non-union employees represented by Local 996 who were laid off by Bates on January 18, 1991 are set forth in Exhibit C. (Stip. [yyy]) Both Exhibit B and Exhibit C are incorporated herein by reference. The collective pay and employee benefits for a sixty-day period for members of Local 996 was four hundred eighty-six thousand three hundred ninety-six dollars and ninety-two cents ($486,396.92). For the eleven non-union Bates employees, the total amount was ninety-five thousand eight hundred fifty dollars and thirty-eight cents ($95,-850.38).

quisition. (Stip. [rrrr]) When the Bank of Boston was informed of this development the next day, the bank ordered Alden to close down effective Friday, February 22, 1991. (Stip. [rrrr])

On February 20, 1991, Benjamin Gottlieb, an officer and director of Alden, told the employees at Alden that February 22nd would be the last day of work. (Stip. [rrrr]) When the Alden Plant closed permanently on February 22, 1991, Alden employed at least fifty-one (51) full time employees. (Stip. [b], [g], [iiii], [rrrr]) At least twenty-four (24) members of the Union were terminated. (Stip. [b], [d], [rrr]) The affected Union employees' names, pay rates and daily pay based on an eight-hour day are as follows:

| | | | | |
|---|---|---|---|---|
| Wildred Gadbois | $9.39 | 1/2 | – | $75.16 |
| Donald Raymond | 9.19 | | – | 73.52 |
| Edward Francis | 9.96 | | – | 79.68 |
| Philip Robert | 10.48 | | – | 83.84 |
| Ronald Carroll | 9.24 | | – | 73.92 |
| Henry Comeau | 10.32 | 1/2 | – | 82.60 |
| Laurent Robert | 9.72 | | – | 77.76 |
| George Hodgins | 9.29 | 1/2 | – | 74.36 |
| Robert Maciejewski | 9.53 | | – | 76.24 |
| William Gauthier | 9.42 | | – | 75.36 |
| Albert Sykes | 10.48 | | – | 83.84 |
| Joseph Presner | 9.62 | 1/2 | – | 77.00 |
| Thomas L'Heureux | 9.24 | | – | 73.92 |
| Cecil Sampson | 9.51 | 1/2 | – | 76.20 |
| David Tavares | 9.61 | | – | 76.88 |
| Anthony Tetuan | 10.71 | | – | 85.68 |
| Ralph Fernandes | 9.19 | | – | 73.52 |
| Paul Berche | 9.95 | | – | 79.60 |
| George Baptiste | 9.67 | | – | 77.36 |
| Dennis Langevin | 10.55 | 1/2 | – | 84.44 |
| David Belanger | 9.38 | | – | 75.04 |
| Edmund Rocha | 10.71 | | – | 85.68 |
| Daniel Belanger | 9.90 | | – | 79.20 |
| William Gary | 9.47 | | – | 75.76 |

(Stip. [f])

At the time of the closing, the Union employees were working full time at the Alden Plant, approximately forty hours per week. (Stip. [u], [x]) The value of sixty days benefits for the twenty-four (24) terminated Union members was twelve thousand eight hundred ninety-six dollars and eighty-eight cents ($12,896.88). (Stip. [yy])

The Union did not receive written notice of the Alden Plant closing. (Stip. [c]) In the opinion of Alden's management, had the employees been apprised of the company's financial circumstances, it would have destroyed any chance for Alden to market the business and thereby save the enterprise. (Stip. [ssss]) Moreover, from and after May of 1990, Alden consulted with outside labor counsel regarding its obligations under the WARN Act. (Stip. [ssss]) Said labor counsel opined that, in light of the fact that Alden and Bates were distinct corporate entities, and each had under one hundred (100) employees, neither corporation fell within the jurisdiction of the WARN Act. (Stip. [ssss])

After the closings of Alden and Bates, the two entities were liquidated and the proceeds applied to satisfy, in full, all the secured creditors of Alden and Bates, including the Bank of Boston. (Stip. [hhhh])

*C. The Defendants' Interrelationships*

To this point, the corporate interrelationships of the defendants have been described as necessary for identification and contextual purposes. In order to be both clear and concise, the officers, directors and common stockholders of each of the defendants shall be delineated in outline form:

1. Alden Holdings
   a. Officers
      Walter Zuckerman, President
      Benjamin M. Gottlieb, Treasurer
      Ronald J. Lowenstein, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Frederic M. Gottlieb
      Stanley Jacobson
   c. Common Stockholders

| | | |
|---|---|---|
| Walter Zuckerman | – | 430 shares |
| Frederic M. Gottlieb | – | 227 shares |
| Benjamin M. Gottlieb | – | 209 shares |
| Andrew J. Gottlieb | – | 18 shares |

James O. Gottlieb &ndash; 18 shares
Stephen P. Gottlieb &ndash; 18 shares

2. Alden
   a. Officers
      Walter Zuckerman, President
      Benjamin M. Gottlieb, Treasurer
      Ronald J. Lowenstein, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Frederic M. Gottlieb
   c. Common Stockholders
      Alden Holdings &ndash; 100%

3. Bates
   a. Officers
      Stanley Jacobson, President
      Walter Zuckerman, Treasurer
      Ronald J. Lowenstein, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Frederic M. Gottlieb
      Stanley Jacobson
   c. Common Stockholders
      Alden Holdings &ndash; 546 shares
      Stephen Gottlieb &ndash; 18 shares
      Andrew Gottlieb &ndash; 18 shares
      James Gottlieb &ndash; 18 shares

4. Scales
   a. Officers
      Walter Zuckerman, President
      Benjamin M. Gottlieb, Treasurer
      Ronald J. Lowenstein, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Stanley Jacobson
   c. Common Stockholders
      unknown

5. Harman
   a. Officers
      Walter Zuckerman, President
      Benjamin M. Gottlieb, Treasurer
      Frederic M. Gottlieb, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Frederic M. Gottlieb
   c. Common Stockholders
      Benjamin M. Gottlieb &ndash; 25%
      Walter Zuckerman &ndash; 50%
      Frederic M. Gottlieb &ndash; 25%

6. Corrugated
   a. Officers
      Walter Zuckerman, President
      Benjamin M. Gottlieb, Treasurer
      Rosalie Canuel, Clerk
   b. Directors
      Walter Zuckerman
      Benjamin M. Gottlieb
      Stanley Jacobson

c. Common Stockholders
unknown

(Stip. [n], [p], [v], [z], [aa], [ww], [xx] and Exhibit A) The parties have stipulated to additional facts with respect to the dealings between the defendant corporations as follows.

During the period from 1987 to 1990, all labor negotiations of Alden and Bates were conducted under the general direction of Benjamin Gottlieb, Walter Zuckerman and Stanley Jacobson. (Stip. [r]) A consultant named Daniel Lawler was separately employed by Alden and Bates to negotiate collective bargaining agreements with the United Paperworkers International Union. (Stip. [q])

Corrugated paid Stanley Jacobson's annual salary which was then allocated between Alden and Bates to approximate the proportional amount of time Jacobson worked at each plant during the previous year. (Stip. [aaaa]) Walter Zuckerman and Benjamin Gottlieb determined the amount to be apportioned to Alden and Bates on an annual basis. (Stip. [aaaa])

As noted earlier, Harman owned the old mill building in New Bedford where the Alden manufacturing operation was located. (Stip. [tt], [kkkk]) Through the end of 1989, Harman charged, and Alden paid, a fair market value rent pursuant to a written agreement to lease the premises. (Stip. [aaa], [kkkk]) Beginning in 1990, Alden paid Harman either a reduced rent, or no rent at all, to occupy the Alden Plant. (Stip. [zz], [kkkk]) There was no written document executed by Harman and Alden reflecting the change in the rental arrangement for 1990 or 1991. (Stip. [bbb]) Further, after the Alden Plant closing, Harman did not actively seek to sell the facility because a corrugator owned by Alden remained on the property. (Stip. [kkkk])

On March 13, 1991, the Bank of Boston discharged a mortgage from Harman on the Alden Plant. (Stip. [ccc]) That mortgage primarily represented secondary collateral to secure an equipment loan to Alden which was paid off in mid–1990. (Stip. [ddd]) Harman never received any consideration from Alden for giving the mortgage. (Stip. [eee])

Harman's actual operating office was the Alden Plant; its bookkeeping was done by Alden. (Stip. [hhh], [iii]) Harman was not listed in the directory as it had no telephone separate from Alden. (Stip. [jjj])

## III. THE LAW

The purpose underlying the WARN Act is to afford a measure of protection to workers, their families and communities by prohibiting certain employers from ordering a plant shutdown or mass layoff in advance of a sixty-day notification to its employees and/or their representative. 20 C.F.R. § 639.1(a) (1994). Specifically, the Act provides in relevant part:

An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—

1. to each representative of the affected employees as of the time of the notice or ... to each affected employee; and

2. to the State dislocated worker unit ... and the chief elected official of the unit of local government within which such closing or layoff is to occur....

29 U.S.C. § 2102(a).

An employer who fails to provide the requisite notice shall be liable to each aggrieved employee for back pay and benefits for each day that the notice was not given. 29 U.S.C. § 2104(a).

As defined in the Act, an employer is ... any business enterprise that employs—

(A) 100 or more employees, excluding part-time employees; or

(B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)

29 U.S.C. § 2101(a)(1).

A plant closing by definition

... means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units

within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding part-time employees.

29 U.S.C. § 2101(a)(2).

Finally, the statutory definition of the term "mass layoff" is

... a reduction in force which—

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30–day period for—

  (i)(I) at least 33 percent of the employees (excluding any part-time employees); and

  (II) at least 50 employees (excluding any part-time employees); or

  (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3).

Based on the stipulated facts in these cases, there is no question that the Union and Local 996 are the representatives of their members who worked at the Alden and Bates Plants and, as such, are entitled to seek enforcement of liability under the WARN Act on behalf of these employees. 29 U.S.C. §§ 2101(a)(4), 2104(a)(5). In addition, pursuant to § 2104(a)(5), Local 996 is the representative of eleven non-union Bates employees who were terminated when the Bates Plant closed. It is further admitted that neither Alden nor Bates provided its employees and/or their representatives with the written sixty-days notification of a plant closing.

■ The stipulated facts reflect that on September 11, 1990, Bates employed at least one hundred twenty-three workers at the Bates Plant. On that date, thirty (30) members of Local 996 were laid off. An additional twenty-four (24) members of Local 996 were laid off by Bates on November 30, 1990. Taken separately, each of the layoffs does not satisfy the requirement of § 2101(a)(3). However, § 2102(d) of the Act permits

in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90–day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

29 U.S.C. § 2102(d).

Since the Bates Plant constitutes a single site of employment or a "single location" according to the regulations, 20 C.F.R. § 639.3(i), where two separate employment losses occurred within a 90–day period, under § 2102(d), the aggregate number of employees must be considered in order to determine whether a mass layoff was effected. As a result of the consecutive layoffs at Bates, a total number of fifty-four (54) employees representing greater than thirty-three percent (33%) of the Bates workforce lost their jobs.[5] Accordingly, the Bates Plant's mass layoffs triggered the notice requirement of § 2102.

■ Although the pertinent numbers under §§ 2101(a)(3) and 2102(d) have been established to demonstrate that a mass layoff occurred, Bates contends that the layoffs were not effected for the purpose of evading the provisions of the WARN Act, but rather were "the result of separate and distinct actions and causes."

The facts undoubtedly evidence that from 1988, Bates was experiencing a financial decline. The expansion of the manufacturing capacity at Bates in May, 1990 has been described as "an operational disaster" from the beginning. Following the reorganization, "business levels dropped significantly each

**5.** In *International Union, United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722, 724 (11 Cir., 1993), when applying § 2101(a)(3)(B)(i)(I), the Eleventh Circuit calculated the relevant percentages of employees laid off at four different sites of employment by dividing the number of workers laid off at each site over the number of workers before layoff at that particular site. *Id.* at 724.

month" at Bates while "monthly losses continued to mount."

The regulations and legislative history shed no light on the meaning of the phrase "separate and distinct actions and causes." However, applying a common sense interpretation, layoffs that are occasioned by a continuing and accelerating economic demise are not the result of separate and distinct causes. Further, there is no evidence in the record to support a finding, either directly or by reasonable inference, as to whether or not Bates was attempting to avoid the requirements of the WARN Act.

As a matter of fact, Bates has failed to carry its burden of proof as allocated under § 2102(d). Therefore, as a matter of law, the September and November layoffs at the Bates Plant must be aggregated such that a mass layoff shall be deemed to have been ordered by Bates.

There is no dispute that the closings of the Alden and Bates Plants constitute plant closings under § 2101(a)(2) of the Act in that each was a permanent shutdown of a single site as a consequence of which over fifty employees suffered the loss of employment. However, in order to establish both the applicability of the WARN Act and the defendants' liability thereunder, the plaintiffs must prove that Alden and Bates were "employers" as defined by § 2101(a)(1) of the statute, i.e., that they were business enterprises that employed one hundred (100) or more employees.

According to the regulations, "[t]he point in time at which the number of employees is to be measured for the purpose of determining coverage is the date the first notice is required to be given." 20 C.F.R. § 639.5(a)(2). Thus, the relevant date for determining whether Alden was an employer is December 25, 1990, sixty days prior to the Alden Plant closing on February 22, 1991. At that time, Alden employed at least fifty-one (51) full time workers. With respect to Bates, the mass layoff occurred on November 30, 1990. Notice should have been given on September 30, 1990 when Bates employed ninety-three (93) workers. On November 18, 1990, sixty days before the Bates Plant closing on January 18, 1991, ninety-three (93)

employees were working for Bates. *See, e.g., United Electrical, Radio and Machine Workers of America (UE) and UE Local 291 v. Maxim, Inc.,* 1990 WL 66578, *1–*2 (D.Mass.1990).

Although neither Alden nor Bates per se had the requisite number of employees working at their respective plants on the relevant dates, the plaintiffs advance several theories pursuant to which they contend that the corporations could be considered employers within the meaning of the WARN Act. The plaintiffs' primary argument is that the defendants are so interconnected that, collectively, they constituted a single business enterprise. There is no dispute that if the Alden and Bates workers were aggregated, the threshold number of one hundred (100) employees on the relevant dates would be met.

### A. Single Business Enterprise

The term "business enterprise" is not defined in the statute. The pertinent regulation provides:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2).

To further clarify the definition of "independent contractors and subsidiaries" as used in § 639.3(a)(2), the Department of Labor has stated:

> The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN purposes; the definition is intended only to summarize existing law that has developed under State Corporations laws and such statutes

as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA). The Department does not believe that there is any reason to attempt to create new law in this area especially for WARN purposes when relevant concepts of State and federal law adequately cover the issue. Thus, no change has been made in the definition. Similarly, the regulation is not intended to foreclose any application of existing law or to identify the source of legal authority for making determinations of whether related entities are separate. To the extent that existing law recognizes the joint employer doctrine or the special situation of the garment industry, nothing in the regulation prevents application of that law. Nor does the regulation preclude recognition of the National Mediation Board as an authoritative decision maker for entities covered by the RLA. Neither does the regulation preclude treatment of operating divisions as separate entities if such divisions could be so defined under existing law.

54 Fed.Reg. 16045 (April 10, 1989).

Against this backdrop, courts interpreting § 639.3(a)(2) have undertaken a tripartite test when addressing the single employer issue. See, *Wholesale and Retail Food Distribution Local 63 v. Santa Fe Terminal Services, Inc.*, 826 F.Supp. 326 (C.D.Cal. 1993) [hereinafter *Local 63* ]. See also, *Local 397, International Union of Electronic, Electrical Salaried Machine and Furniture Workers AFL–CIO v. Midwest Fasteners, Inc.*, 779 F.Supp. 788 (D.N.J.1992) [hereinafter *Local 397 II* ].[6] The analysis incorporates consideration of "(1) state corporate law, (2) single employer theory under federal law, and (3) the WARN regulations." *Local 63*, 826 F.Supp. at 334.

### 1. State Corporate Law

■ Under Massachusetts common law, piercing of the corporate veil is permitted only in rare instances. See *Berger v. H.P. Hood*, 416 Mass. 652, 657–58, 624 N.E.2d 947, 950 (1993); *Evans v. Multicon Construction Corporation*, 30 Mass.App.Ct. 728, 732, 574

N.E.2d 395, 398 (1991); *see also, United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1091 (1 Cir., 1992) [hereinafter *163 Pleasant Street Corp.* ]. One corporation may be held liable for the actions of another

... (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619, 233 N.E.2d 748, 752 (1968). *Accord, Evans*, 30 Mass. App.Ct. at 732–733, 574 N.E.2d at 398.

■ Courts have limned the *My Bread* criteria

... into twelve factors which should be considered in deciding whether to penetrate the corporate form: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) syphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.

*Evans*, 30 Mass.App.Ct. at 733, 574 N.E.2d at 398 (citing *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14–16 (1 Cir., 1985)).

■ The record quite clearly demonstrates that the six corporate defendants in

---

**6.** *Local 397 II* is the second proceeding in the above mentioned case. An earlier proceeding is also referred to in this opinion which will be denoted as *Local 397 I*.

these cases share common and intertwined ownership. Similarly, there is evidence reflecting the control exercised by Alden Holdings over Alden and Bates, as well as indicia of intermingling of the business activity, assets and management of the three corporations. However, with respect to the remaining nine factors to be considered, there has been little or no definitive evidence proffered. In short, the facts of these cases do not support a conclusion that the corporate defendants were alter egos within the meaning of Massachusetts law.[7]

### 2. Single Employer

■ The First Circuit has articulated the test to be applied when considering whether "nominally separate corporations constitute a a 'single employer'", stating:

> To determine whether two or more business entities comprise a single employer, this court has applied the four facts set out in *Radio & Television Broadcast Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam): (1) inter-relation of operations, (2) common management, (3) centralized control of labor relations and (4) common ownership. *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1075 (1981). No one of these facts is controlling, nor need all of them be present. Single employer status ultimately depends on "all the circumstances of the case" and is marked by an absence of an "arms length relationship found among unintegrated companies."

*Penntech Papers, Inc. v. National Labor Relations Board*, 706 F.2d 18, 24–25 (1 Cir., 1983) (citations omitted); *see also, C.E.K. Industrial Mechanical Contractors, Inc. v. National Labor Relations Board*, 921 F.2d 350, 353–54 (1 Cir., 1990).

It is readily apparent that the analysis for a single employer under federal law is markedly different from that undertaken in determining the question of corporate alter ego under state law.

Addressing the first factor, it is true as the defendants note that although Alden and Bates were both in the corrugated cardboard products business, they operated at different levels of the industry, sometimes competing with each other. It is equally true, however, that Alden Holdings established a line of credit for the use and benefit of Alden and Bates. In May of 1990, the two corporations' loans from the Bank of Boston were cross-collateralized with each other's property, as well as the property of Scales. At the same time, Alden transferred its finished box business to Bates, and permitted Bates to assume the Alden name, for no compensation. Simultaneously, several of Alden's employees, including the plant manager and five or six salespeople, moved over to Bates.

In September, 1990, Alden, Bates and Alden Holdings acted in concert to call a meeting with Alden's and Bates' paper suppliers. Representatives of all three corporations attended the meeting during which, inter alia, certain paper purchases for Alden and Bates were coordinated.

Stanley Jacobson simultaneously served as the executive vice president of Alden and the president of Bates. His annual salary was apportioned between the two corporations by Walter Zuckerman and Benjamin M. Gottlieb to approximate the amount of time Mr. Jacobson worked for each corporation the previous year. It is unclear whether Messrs. Zuckerman and Gottlieb made these salary decisions as officers and directors of Corrugated, Alden Holdings, Alden or Bates.[8]

Based upon the evidence, it is fair to conclude that at least from and after May of 1990, there was an interrelationship of operations as between Alden and Bates.

It is clear from the undisputed facts that all six of the corporate defendants share, with minimal deviation, the same officers and

---

7. The plaintiffs would fare no better if the federal veil-piercing standard were to be applied in these cases. The First Circuit has concluded that "litigants who insist that the corporate veil be brushed aside must first prove three things: lack of corporate independence, fraudulent intent, and manifest injustice." *163 Pleasant Street*

*Corp.*, 960 F.2d at 1093. There has been no allegation or proof of fraud in these cases.

8. Neither Mr. Zuckerman nor Mr. Gottlieb was an officer of Bates.

directors. Thus the second factor of common management is satisfied.

The third consideration is centralized control of labor relations. Of the corporate defendants, only Alden and Bates had employees. The two corporations separately employed a consultant named David Lawler to negotiate collective bargaining agreements with the United Paperworkers International Union. From 1987 through 1990, all labor negotiations of Alden and Bates were conducted under the tutelage of Benjamin Gottlieb, Walter Zuckerman and Stanley Jacobson. While the evidence is somewhat sparse, it appears that although Alden and Bates negotiated individually, those negotiations were nevertheless directed by the same three individuals.

There is no evidence in the record regarding the common stockholders of defendants Scales and Corrugated. With respect to the other four defendants, the facts reveal that Walter Zuckerman, Benjamin M. Gottlieb and Frederic M. Gottlieb are all stockholders of each of the corporations and collectively own all, or the vast majority of, the stock of Alden Holdings, Alden, Bates and Harman.

After considering all of the undisputed facts and the circumstances of these cases, it must be concluded as a matter of law that Alden, Bates and Alden Holdings constituted a single employer under the federal law standard. While there is evidence in the record with respect to the interrelatedness of Scales, Harman and Corrugated, the facts tend to show primarily a congruence of ownership and management. There is insufficient evidence to support a conclusion that these latter three corporations acted together as a single employer.

### 3. The WARN Regulations

■ The factors suggested to be weighed in the WARN regulations are quite similar to those in the single employer analysis. The facts of common ownership and management of the corporate defendants have already been established, and need not be repeated. Similarly, the centralized control of labor negotiations has been discussed, as has the interdependency of the Alden and Bates operations. The final factor to be examined is de facto control.

A number of facts underscore the control that Alden Holdings had, and exercised, over Alden and Bates. Alden Holdings owned all the stock of Alden and ninety-one percent (91%) of the stock of Bates. The primary stockholders of Alden Holdings, Walter Zuckerman, Benjamin Gottlieb and Frederic M. Gottlieb, with one exception, were each officers and directors of Alden Holdings, Alden and Bates. Three of the four directors of Alden Holdings supervised the labor negotiations of Alden and Bates. Alden Holdings secured financing for Alden and Bates. Two of the officers/directors of Alden Holdings determined the allocation of Stanley Jacobson's salary between Alden and Bates. Representatives of Alden Holdings attended the meeting of Alden's and Bates' paper suppliers. De facto control of Alden and Bates by Alden Holdings is amply supported by the record.

Considering the factors set forth in the WARN regulations, the plaintiffs have proven that defendants Alden Holdings, Alden and Bates were a single business enterprise.

■ To summarize, a conclusion in favor of the separateness of defendants is reached under state common law. However, when the tests predicated on federal law are applied, Alden Holdings, Alden and Bates must be deemed to be a single business enterprise. Given these disparate results, it is important to bear in mind that the WARN Act,

> ... like other federal labor statutes, has as its goal the protection of workers, and therefore, the single employer test and the factors enumerated in the D.O.L. regulations, which echo and expand the single employer test, are persuasive.

*Local 397 II,* 779 F.Supp. at 800.

Consequently, Alden Holdings, Alden and Bates are found to be a single business enterprise. Together, their aggregate number of workers surpasses the minimum number of employees required for the provisions of the WARN Act to apply. As a matter of law, Alden Holdings, Alden and Bates were a single employer and, as such, are liable for the established violations of the WARN Act.

## B. The Defenses

Invoking the provisions of 29 U.S.C. §§ 2102(b)(1) and (b)(2)(A), the defendants contest their liability under the WARN Act for admittedly having failed to give the mandated sixty days notification to their affected workers. These two statutory exemptions, the so-called "faltering company" exception and the "unforeseeable business circumstances" exception respectively, relieve employers of their obligation to provide the required notification under certain discrete circumstances. As defenses to liability, "[t]he employer bears the burden of proof that conditions for the exceptions have been met." 20 C.F.R. § 639.9.

It should be noted at the outset that the defendants' entitlement to rely upon these defenses at all is open to question. The WARN Act clearly states that "[a]n employer relying on this subsection [§ 2102(b)] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2101(b)(3). The implementing regulations explain, in similar precatory language:

> ... If one of the exceptions is applicable, the employer must give as much notice as is practicable to the union, non-represented employees, the State dislocated worker unit, and the unit of local government and this may, in some circumstances, be notice after the act. The employer must, at the time notice actually is given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in § 639.7.

20 C.F.R. § 639.9.

The referenced section, § 639.7, details the specific information that must be provided in the *written* notification.

The facts are undisputed that the sole notification in these cases was given verbally by Benjamin Gottlieb to the companies' employees within a matter of days of the respective plant closings. Having failed to provide any written notification incorporating the specified information to any person or entity at any time, Alden and Bates have plainly failed to adhere to the unequivocal mandate of both the statute and the regulations. Although in the circumstances of this case this issue need not be resolved, it appears likely that this failure alone would constitute sufficient grounds to deny the applicability of the exemption provisions.

### 1. The Faltering Company Exception

Title 29 U.S.C. § 2102(b)(1) provides for a reduction in the notification period as follows:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

The legislative history with respect to this statutory provision clarifies the meaning and intent of the exception. As explained in the conference committee report,

> Faltering Company. The provision would permit, under specifically defined circumstances, an employer to shut down one or more sites of employment without providing the full notice required by the bill. The defense is intended as a narrow one applicable only where it was unclear 60 days before the closing whether the closing would occur; the employer was actively pursuing measures that would avoid or indefinitely postpone the closing; and the employer reasonably believed both that it had a realistic opportunity of obtaining the necessary capital or business and that giving notice would prevent the employer's actions from succeeding.

The key phrases are first that the employer was "actively seeking capital or business"; second that, had the employer obtained this capital or business, it "would have enabled the employer" to prevent or forestall the shutdown; and third, that the employer "reasonably and in good faith believed" that giving the notice required would have precluded the employer from obtaining the necessary capital or business that it had a realistic opportunity to obtain.

Thus, to avail itself of this defense an employer must prove the specific steps it had taken, at or shortly before the time notice would have been required, to obtain a loan, to issue bonds or stock, or to secure new business. This duty to seek capital or business falls on the employer, not the single site alone, and assumes that the employer must show the reasonable basis for its good-faith belief that giving the required notice would have prevented the employer from obtaining the capital or business that the employer had a realistic opportunity to obtain. Finally, the employer also must show that, upon learning that the workplace would be closed, it promptly notified the employees and explained why earlier notice had not been given.

1988 U.S.Code Cong. & Adm.News 2078, at 2081–82.

■ The Secretary of Labor, as authorized, has promulgated regulations to interpret and implement the WARN Act. 29 U.S.C. § 2107. In order to qualify for the "faltering company" exemption, it is incumbent upon an employer to demonstrate that the four conditions outlined in the applicable regulations are met. *Local 397, International Union of Electronic, Electrical, Salaried Machine and Furniture Workers v. Midwest Fasteners, Inc.*, 763 F.Supp. 78, 82 (D.N.J., 1990) [hereinafter *Local 397 I* ].

First, an employer must prove that at the time the 60–day notice would have been required, it was "actively seeking capital or business" meaning either "financing or refinancing" or "additional money, credit or business through any other commercially reasonable method." 20 C.F.R. § 639.9(a)(1). Specific actions undertaken by the employer to obtain such capital or business must be identified. *Id.*

Second, the employer must demonstrate that there then existed "a realistic opportunity to obtain the financing or business sought." 20 C.F.R. § 639.9(a)(2). Third, supported by objective proof, the financing or business sought must be shown to "have

been sufficient, if obtained, to have enabled the employer to avoid or postpone the shutdown." 20 C.F.R. § 639.9(a)(3). Fourth, the employer must "objectively demonstrate" that it "reasonably and in good faith ... believed that giving the required notice would have precluded the employer from obtaining the needed capital or business." 20 C.F.R. § 639.9(a)(4).

■ As previously determined, written notification of the Alden Plant closing should have been given on December 25, 1990. At that time, Alden owed several million dollars to its paper suppliers and, consequently, was on a C.O.D. basis with them. This credit crunch caused cash flow problems rendering Alden unable to procure raw materials and manufacture its product competitively.

Although it was "succeeding in developing new customers," there is no evidence in the record with respect to what specific steps Alden was taking to seek new business. Similarly, there is a complete absence of objective proof that this new business, if the expansion of the customer base were to continue, would have enabled Alden to avoid or postpone the closing.

The end of the year financial figures were "extremely poor" prompting the Bank of Boston to call its loan while allowing Alden to operate on a week-to-week basis. It was at this juncture in January, 1991, that Alden tried to locate a potential purchaser. While it may be inferred from the circumstances that the bank believed that Alden was saleable as an ongoing business concern, additional objective, supporting details have not been proffered.[9]

Finally, although Alden management's opinion was that if the employees were advised of the company's financial condition that it would have destroyed Alden's ability to market its business, there is not a scintilla of objective proof in the record to demonstrate that this belief was held reasonably and in good faith.

---

9. One court has concluded that coordinating the sale of a plant does not fall within the meaning of, or qualify as, "actively seeking capital or business." *See, Local 397 I,* 763 F.Supp. at 83–84.

Bearing in mind that this exemption is to be narrowly construed, the Court finds that Alden has failed to carry its burden of proof necessary to demonstrate the applicability of the "faltering company" exception. *See, Washington v. Aircap Industries Corp.,* 831 F.Supp. 1292, 1295 (D.S.C., 1993); *Carpenters District Council of New Orleans v. Dillard Department Stores, Inc.,* 778 F.Supp. 297, 305 (E.D.La., 1991).

With respect to the Bates Plant closing,[10] the 60–day notification should have been given on November 18, 1990. Like Alden, as of September, 1990, Bates received paper from its suppliers on a cash-on-delivery basis only. That month, thirty (30) of its union employees were laid off. In November, 1990, with its loan assigned to the workout department of the Bank of Boston, Bates laid off an additional twenty-four (24) members of Local 996.

From and after the business reorganization in May of 1990, its financial losses continued to mount as Bates proved unable to manage effectively the finished box business transferred from Alden. Although a decision was made to attempt to sell the Bates operation in November, 1990, no interested buyers could be found. There is absolutely no evidence in the record with regard to what specific steps Bates took to sell its business.

After receipt of Bates' 1990 year-end figures, the Bank of Boston called the company's loan effective January 18, 1991. Again, there is no objective proof in the record to demonstrate that Bates' expectation that its operation could be maintained was held reasonably and in good faith.

Based on this record, the Court finds that Bates has failed to carry its burden of proof that the conditions for the "faltering company" exception have been met.

### 2. The Unforeseeable Business Circumstances Exception

As a second exception to the notification requirement, the WARN Act provides:

> An employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

29 U.S.C. § 2102(b)(2)(A).

Reference to the congressional conference committee reports aids in understanding the concerns underlying this statutory provision:

> Unforeseeable Business Circumstances. The Conferees recognize that there may be cases in which unforeseeable events necessitate a plant closing or mass layoff and it is not economically feasible to require the employer to give notice and wait until the end of the notice period before effecting the plant closing or mass layoff. For example, a natural disaster may destroy part of a plant; a principal client of the employer may suddenly and unexpectedly terminate or repudiate a major contract; or an employer may experience a sudden, unexpected and dramatic change in business conditions such as price, cost, or declines in customer orders. In these situations, the employer is required to give notice as soon as the closing or mass layoff becomes reasonably foreseeable, but the employer is permitted to implement the proposed closing or layoff without waiting until the end of the full notice period.

1988 U.S.Code Cong. & Adm.News 2078 at 2082.

The regulations likewise are instructive in interpreting and applying this exception, stating in relevant part:

> An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control.

> The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated em-

---

**10.** The "faltering company" exception applies only to the plant closings, not mass layoffs. *See,*

20 C.F.R. § 639.9(a).

ployer in predicting the demands of its particular market. . . .

20 C.F.R. §§ 639.9(b)(1) and (2).

Both Alden and Bates contend that the decision by the Bank of Boston to call their loans and order that they cease operations was an unforeseen business circumstance.

The fiscal misfortunes of both companies were apparent even before May of 1990, as evidenced by the ever increasing losses they sustained beginning in 1988 as well as the fact that their loans were in a workout mode with the Bank of Boston. The slide continued unabated after the business reorganization as reflected by the C.O.D. decision of their paper suppliers in September, 1990. The extremely poor year end figures demonstrate that both Alden's and Bates' financial decline accelerated dramatically in the latter part of 1990.

In light of this deepening downward fiscal spiral, the Bank of Boston's ultimate order to cease operations cannot be viewed as an unforeseen business circumstance within the meaning of the WARN Act. While certainly dramatic, the decision was neither unforeseen or sudden, but rather the culmination of the continuing, and admittedly worsening, financial devastation of Alden and Bates. In the exercise of commercially reasonable business judgment, Alden and Bates could have anticipated by the end of 1990 that their plants would be forced to close, and, therefore, could have given the notification required by the WARN Act. *See, Carpenters District,* 778 F.Supp. at 306–07; *Parsley v. Kunja Knitting Mills, USA, Inc.,* 1991 WL 340563, *4–*6 (D.S.C.1991); *cf. Local 63,* 826 F.Supp. 326.

### C. Reductions

■ The Court is afforded the discretion to reduce the amount of the liability or penalty to be assessed against an employer if that employer proves that it acted in good faith and had reasonable grounds for believing that its acts or omissions were not a violation of the WARN Act. 29 U.S.C. § 2104(a)(4). The defendants propose that there are ample grounds for such a reduction in this case.

Alden and Bates contend that they did not simply ignore the provisions of the Act. Indeed, it is noted that when Alden laid off seventy-five (75) employees in May of 1990 at a time that more than one hundred (100) people were employed at the Alden Plant, the required notification was provided. Rather, the defendants assert that they consulted outside labor counsel with respect to their obligations and relied upon counsel's opinion that they fell outside the jurisdiction of the WARN Act. Alden and Bates argue that these facts, coupled with the limited caselaw available to offer guidance in this area, demonstrate their good faith.

To be sure, due to its fairly recent enactment, in large measure the WARN Act represents uncharted waters. The legal issues involved in this case were quite challenging in their complexity. These very circumstances, however, undercut the reasonableness of the defendants' reliance upon what appears to be a rather simplistic opinion of labor counsel. As has been seen, the mere facts that Alden and Bates were distinct entities and that they each had less than one hundred (100) employees at the time that they closed barely scratch the surface of the jurisdictional inquiry under the WARN Act. Moreover, even a cursory review of the statute and regulations underscore the importance and significance of providing notification to employees.[11]

Finally, Alden and Bates state that at all times they acted in the best interest of their employees. While this may be true, Con-

---

11. For example, the regulations explicitly provide that in ambiguous situations,
> It is civically desirable and it would appear to be good business practice for an employer to provide advance notice to its workers or unions, local government and the State when terminating a significant number of employees. In practical terms, there are some questions and ambiguities of interpretation inherent in the application of WARN to business practices in the market economy that cannot be addressed in these regulations. It is therefore prudent for employers to weigh the desirability of advance notice against the possibility of expense and time-consuming litigation to resolve disputes where notice has not been given. The Department encourages employers to give notice in all circumstances.

20 C.F.R. § 639.1(e).

gress has determined that compliance with the provisions of the WARN Act is in the best interest of the employees, and employers are not permitted to substitute their subjective judgment about what is in the employees' best interest for the requirements of that Act.

Having considered all of the facts and circumstances of these cases, the Court declines to exercise its discretion to reduce the amount of the liability or penalty to be assessed against the defendants.

### D. Damages

An employer found to have violated the WARN Act shall be liable to each aggrieved employee for back pay for each day of violation as well as benefits under an employee benefit plan. 29 U.S.C. § 2104(a)(1). Given that no notices were provided in these cases, liability is calculated based on the maximum allowable period of violation, i.e., sixty days. *Id.*

The amounts of back pay and benefits are the subject of stipulation by the parties. Based on an eight hour day, the collective daily pay of the twenty-four Union members who were terminated by Alden in the Alden Plant closing was one thousand eight hundred seventy-six dollars and fifty-six cents ($1,876.56) (Stip. [f]) The collective daily pay multiplied by the sixty-day period of violation equals one hundred twelve thousand five hundred ninety-three dollars and sixty cents ($112,593.60). The value of sixty days of benefits for these same Union members is twelve thousand eight hundred ninety-six dollars and eighty-eight cents ($12,896.88) (Stip. [yy])

The total amount of collective daily pay and employee benefits for the members of Local 996 laid off and/or terminated at Bates for a sixty-day period is four hundred eighty-six thousand, three hundred ninety-six dollars and ninety-two cents ($486,396.92) (Stip. [xxx], Exh. B) The value of sixty days collective pay and employee benefits for the eleven non-union Bates employees terminated when the Bates Plant closed is ninety-five thousand eight hundred fifty dollars and thirty-eight cents ($95,850.38). (Stip. [yyy], Exh. C)

### IV. CONCLUSION

Accordingly, judgment shall enter in C.A. 91–11763–WGY in favor of the plaintiffs as against defendants Alden, Alden Holdings and Bates in the amount of one hundred twenty-five thousand four hundred ninety dollars and forty-eight cents ($125,490.48). Judgment shall enter in C.A. 91–11763–WGY in favor of the defendants Scales, Harman and Corrugated.

Judgment shall enter in C.A. 91–10327–WGY in favor of plaintiff as against defendant Bates in the amount of five hundred eighty-two thousand, two hundred forty-seven dollars and thirty cents ($582,247.30).